# Competitive Bidding Requirements Under the Federal-Aid Highway Program

The competitive bidding requirement of 23 U.S.C. § 112 imposes, in addition to procedural rules dictating the process by which bids are awarded, a substantive limitation on state or local bidding requirements that are unrelated to the bidder's performance of the necessary work.

Section 112's competitive bidding requirement does not preclude any and all state or local bidding or contractual restrictions that have the effect of reducing the pool of potential bidders for reasons unrelated to the performance of the necessary work. Rather, section 112 affords the Federal Highway Administration discretion to assess whether a particular state or local requirement unduly limits competition.

Generally, state or local government requirements that eliminate or disadvantage a class of potential responsible bidders to advance objectives unrelated to the efficient use of federal funds or the integrity of the bidding process are likely to unduly impede competition in contravention of the substantive component of section 112's competitive bidding requirement.

August 23, 2013

MEMORANDUM OPINION FOR THE ACTING GENERAL COUNSEL
DEPARTMENT OF TRANSPORTATION

This memorandum responds to your office's request for an opinion regarding the requirement in 23 U.S.C. § 112 that state and local governments receiving federal-aid highway grant funds use competitive bidding in awarding highway construction contracts.[1]

Section 112 requires a state transportation department to award contracts using federal highway funds by "competitive bidding, unless the State transportation department demonstrates . . . that some other method is more cost effective." 23 U.S.C. § 112(b)(1) (2006); *see also id.* § 112(a) ("The Secretary shall require such plans and specifications and such methods of bidding as shall be effective in securing competition."). For a bidding process to be "competitive," the state transportation department must award contracts for projects "only on the basis of the lowest responsive bid submitted by a bidder meeting established criteria of responsibility." *Id.* § 112(b)(1). A 1986 opinion of this office concluded that section 112 obligated the Secretary of Transportation to withhold federal funding for highway construction contracts that were subject to a New York City law imposing disadvantages on a class of responsible bidders, where the city failed to demonstrate that its departure from competitive bidding requirements was justified by considerations of cost-effectiveness. *See Compatibility of New York City Local Law 19 with Federal Highway Act Competitive Bidding Requirements*, 10 Op. O.L.C. 101 (1986) ("*Competitive Bidding Requirements*"). Since the issuance of

---

[1] *See* Letter for Virginia Seitz, Assistant Attorney General, Office of Legal Counsel, from Robert S. Rivkin, General Counsel, Department of Transportation (Oct. 3, 2012) ("DOT Letter").

our 1986 opinion, the Federal Highway Administration ("FHWA"), the Department of Transportation ("DOT") agency that has been delegated authority to administer the Federal-Aid Highway Program, *see* 49 U.S.C. § 104 (2006); 49 C.F.R. § 1.85(a)(1) (2012), has taken the position that state or local bidding specifications or contract requirements that limit the pool of potential bidders violate section 112's competition requirement unless they directly relate to the bidder's performance of the necessary work in a competent and responsible manner. DOT Letter at 1, 3.

In connection with a reevaluation by DOT of FHWA's position, your office has asked whether section 112's competitive bidding requirement compels FHWA to adhere to this approach, or whether section 112 leaves room in some circumstances for state or local bidding requirements that may limit the pool of potential bidders for specific federal-aid highway construction contracts for reasons other than the bidder's ability to perform the work in a competent and responsible manner. *Id.* at 1, 7.[2] Answering your office's question involves resolving two related issues: (1) whether section 112(b)(1)'s requirement that contracts be awarded by "competitive bidding" imposes, in addition to procedural rules dictating the process by which bids are awarded,[3] any substantive limitation on state or local bidding requirements that are unrelated to the bidder's performance of the necessary work; and (2) if section 112(b)(1) imposes a substantive limitation, what is the nature of that limitation. As we explain in Part II below, in our view section 112's "competitive bidding" requirement has a "substantive" component. That is, even where a bidding process meets the procedural requirements of competitive bidding, it may nonetheless violate section 112's competitive bidding requirement in substance if responsive bidders are required to comply with state or local requirements that unduly limit the pool of potential bidders. However, we do not believe that the statute's competitive bidding requirement precludes any and all state or local bidding or contractual restrictions that have the effect of reducing the pool of potential bidders for reasons unrelated to the performance of the necessary work. Rather, we believe that section 112 affords the FHWA Administrator (as the Secretary's delegee) discretion to assess whether a particular state or local requirement unduly limits competition.

We address what unduly limiting competition entails in this context in Part III. A state or local requirement that has only an incidental effect on the pool of potential bidders or that imposes reasonable requirements related to the performance of the necessary work would not unduly limit competition. But a require-

---

[2] Although FHWA has promulgated regulations governing the policies, requirements, and procedures relating to federal-aid highway projects, *see* 23 C.F.R. pt. 635 (2012), your office has asked about, and we address, only the scope of the statutory requirements, *see* 23 U.S.C. § 112.

[3] Examples of such "procedural" rules are the process requirements that bids be solicited from a pool of potential responsible contractors based on specifications advertised in advance and that the contract be awarded to the lowest responsive bidder.

ment that has more than an incidental effect on the pool of potential bidders and does not relate to the work's performance would unduly limit competition unless it promotes the efficient and effective use of federal funds. In assessing whether a requirement does so, FHWA may take into account both whether the requirement promotes such efficiency in connection with the letting of a particular contract and also whether it more generally furthers the efficient and effective use of federal funds in the long run or protects the integrity of the competitive bidding process itself. Where a state or local requirement serves these purposes, we believe the Administrator may reasonably determine, consistent with section 112, that the requirement does not unduly limit competition, even if it may have the effect of reducing the number of eligible bidders for a particular contract. Generally speaking, however, state or local government requirements that eliminate or disadvantage a class of potential responsible bidders (and thus have a non-trivial effect on the pool of such bidders) to advance objectives unrelated to the efficient use of federal funds or the integrity of the bidding process (or to the performance of the necessary work in a competent and responsible manner) are likely to unduly impede competition in contravention of the substantive component of section 112's competitive bidding requirement.

## I.

Some background is necessary to place our reasoning in context. Pursuant to 23 U.S.C. §§ 104 and 302 (2006 & Supp. V 2011), FHWA disburses federal-aid highway funds to states, which administer those funds through their transportation departments. Section 112, on the letting of contracts, requires both (1) that federally funded highway construction projects performed or supervised by state transportation departments be awarded by contract through a competitive bidding process, unless an exception applies; and (2) that the Secretary of Transportation require whatever plans and specifications and methods of bidding as are necessary to be effective in securing competition. The section provides in relevant part:

> (a) In all cases where the construction is to be performed by the State transportation department or under its supervision, a request for submission of bids shall be made by advertisement unless some other method is approved by the Secretary. The Secretary shall require such plans and specifications and such methods of bidding as shall be effective in securing competition.

> (b) Bidding requirements.—

>> (1) In general.—Subject to paragraphs (2) and (3), construction of each project, subject to the provisions of subsection (a) of this section, shall be performed by contract awarded by competitive bidding, unless the State transportation department demonstrates,

> to the satisfaction of the Secretary, that some other method is more cost effective or that an emergency exists. Contracts for the construction of each project shall be awarded only on the basis of the lowest responsive bid submitted by a bidder meeting established criteria of responsibility. No requirement or obligation shall be imposed as a condition precedent to the award of a contract to such bidder for a project, or to the Secretary's concurrence in the award of a contract to such bidder, unless such requirement or obligation is otherwise lawful and is specifically set forth in the advertised specifications.

23 U.S.C. § 112(a) & (b)(1). Section 112(d) bars state transportation departments and local subdivisions from entering into a contract awarded by competitive bidding pursuant to subsection (b) and subject to the provisions of section 112, "without compliance with the provisions of this section" and without "the prior concurrence" of the Secretary in the contract award. *Id.* § 112(d). In addition, Congress has delegated to the Secretary authority "to prescribe and promulgate all needful rules and regulations for the carrying out of the provisions" of the title. *Id.* § 315 (2006).

In 1986, we considered the application of section 112 to a New York City law, Local Law 19, that authorized the city to impose disadvantages on bidders for city contracts who failed to sign an anti-apartheid certificate stating (1) that in the previous twelve months they had not conducted, and for the term of the impending contract they would not conduct, business with South Africa or Namibia; and (2) that in contracts to supply goods to the city, none of the goods originated in South Africa or Namibia. *Competitive Bidding Requirements*, 10 Op. O.L.C. at 101–02. Local Law 19 provided that if a bidder complying with the anti-apartheid certification requirement made a bid no more than five percent higher than a low bid submitted by a non-complying contractor, both bids were to be passed on to a city board. That board was authorized to determine that it was in the "public interest" to award the contract to a bidder other than the lowest responsible bidder. *Id.* at 102. New York City declared its intention to apply the law to federally funded projects. *Id.*

Our opinion concluded that section 112 required the Department of Transportation to withhold funding for highway construction projects subject to Local Law 19. We explained that section 112 "reflect[ed] a congressional judgment that the efficient use of federal funds afforded by competitive bidding is to be the overriding objective of all procurement rules for federally funded highway projects, superseding any local interest in using federal funds to advance a local objective." *Id.* at 103. We found that "[b]y imposing disadvantages on a class of responsible bidders," Local Law 19 "distort[ed] the process of competitive bidding" in order to advance a local objective "unrelated to the cost-effective use of federal funds." *Id.* In addition, the opinion emphasized, the 1983 amendment to section

112(b)(1)—which imposed the current requirement that departures from competitive bidding be justified by a demonstration that they are more cost-effective than the alternative—made clear that "the efficient use of federal funds is the touchstone by which the legality of state procurement rules for federally funded highway projects is to be tested." *Id.* at 105. By imposing disadvantages on a certain class of contractors (those who had not signed an anti-apartheid certificate), we concluded, the city may have discouraged responsible contractors from bidding and undermined the competitive bidding process without demonstrating that the requirement was cost-effective. *Id.* The opinion did not consider other types of bidding restrictions and did not address the legality of restrictions designed to protect the integrity of the competitive bidding process or to promote the efficient use of federal funds over the long term.

Your office has explained that, since the issuance of our 1986 opinion, FHWA has taken the position that, in the absence of federal statutory authorization, state or local requirements that restrict the pool of applicants available to bid on a federal-aid highway contract, or that otherwise favor certain potential bidders over others in ways unrelated to the capability of the bidder to perform the work, conflict with the competition requirements in section 112 and the agency's regulations implementing that section,[4] and therefore are not permitted. DOT Letter at 1–6. Consequently, FHWA has prohibited state and local grant recipients from adopting policy preferences restricting bidders' political contributions (so-called "pay-to-play" provisions), requiring equal benefits for domestic partners, or mandating the inclusion of local hiring preferences or project labor agreements, on the ground that these policy preferences violate section 112. *Id.* at 1, 4–6.

## II.

We first address the threshold question of whether section 112(b)(1)'s requirement that federally aided construction projects be "performed by contract awarded by competitive bidding," 23 U.S.C. § 112(b)(1), contains a substantive component

---

[4] In this regard, FHWA's implementing regulations require, in part, that "[a]ctual construction work . . . be performed by contract awarded by competitive bidding," unless the state transportation department "demonstrates to the satisfaction of the Division Administrator that some other method is more cost effective or that an emergency exists," 23 C.F.R. § 635.104(a), and obligate the state transportation department to "assure opportunity for free, open, and competitive bidding." *Id.* To that end, the regulations prohibit approval of any "procedure or requirement for bonding, insurance, prequalification, qualification, or licensing of contractors" which, "in the judgment of the Division Administrator, may operate to restrict competition, to prevent submission of a bid by, or to prohibit the consideration of a bid submitted by, any responsible contractor, whether resident or non-resident of the State wherein the work is to be performed." *Id.* § 635.110(b). The regulations further provide that "[i]f any provisions of State laws, specifications, regulations, or policies may operate in any manner contrary to Federal requirements . . . to prevent submission of a bid, or prohibit consideration of a bid submitted by any responsible bidder appropriately qualified in accordance with § 635.110, such provisions shall not be applicable to Federal-aid projects." *Id.* § 635.112(d).

authorizing FHWA to examine bid specifications and conditions to determine whether they impede competition, or whether it requires only, as a matter of process, that the contract be awarded to the lowest responsive bidder, but otherwise leaves state and local governments free to impose on bidders whatever conditions they choose, including conditions that reduce the pool of potential bidders for reasons unrelated to the cost-effective use of federal funds.

In our 1986 opinion, we concluded that New York City's anti-apartheid certification requirement violated the procedural requirement of competitive bidding that contracts be awarded to the lowest responsible bidder and was therefore incompatible with the statute. *See Competitive Bidding Requirements*, 10 Op. O.L.C. at 104–07. However, our opinion also implicitly recognized that section 112's competitive bidding requirement has a substantive dimension that calls into question any state and local requirements that diminish the pool of eligible contractors, absent a showing of greater cost effectiveness. *See, e.g.*, *id.* at 105 ("By imposing disadvantages on a certain class of contractors, New York City discourages responsible contractors from bidding and undermines the competitive bidding process."); *id.* ("The 1982 amendments . . . make clear that the efficient use of federal funds is the touchstone by which the legality of state procurement rules for federally funded highway projects is to be tested.").

We have reassessed our opinion in light of contrary dicta in a 2007 decision of the U.S. Court of Appeals for the Sixth Circuit, cited in the DOT Letter at page 5. In *City of Cleveland v. Ohio*, 508 F.3d 827 (6th Cir. 2007), the court sustained FHWA's withdrawal of federal funds from a Cleveland public works project on the ground that the city had incorporated a local hiring preference into the contract without advertising the preference in the bid specifications—a violation of section 112(b)(1), which prohibits the imposition of a requirement or obligation as a condition precedent to the award of a contract "unless such requirement or obligation . . . is specifically set forth in the advertised specifications." *Id.* at 843 (quoting 23 U.S.C. § 112(b)(1)). In dicta, the court added that the statute's reference to "competitive bidding" was intended to deal "*only* with the process of how bids are awarded—competitive bidding or 'some other method'—not the substance of the underlying contracts themselves." *Id.* at 841 (emphasis in original). The court rejected FHWA's argument that the public body awarding the contract was required to justify its "requirements or obligations" as "more cost effective" than competitive bidding, or necessitated by emergency. Instead, in the court's view, such conditions apply only when the body awarding the contract "seeks to depart from competitive bidding as the *method* for awarding a contract." *Id.* (emphasis in original). Thus, the court concluded that section 112(b) "by itself confers no authority upon the FHWA to evaluate substantive contract require-

ments to determine whether they might inhibit competition or disqualify otherwise qualified bidders." *Id.*[5]

Contrary to the Sixth Circuit's dicta, we continue to believe that section 112(b)(1) is best read to impose more than a procedural requirement that a state or local highway department accept the lowest responsive bid after soliciting bids from a pool of potential responsible bidders. Instead, section 112(b)(1) requires FHWA to evaluate state or local bidding specifications or contract requirements to determine whether they unduly inhibit competition. To explain how we reach this conclusion, we begin with the text of section 112, first examining the historical evolution of the statute and then describing the prevailing understanding of the concept of "competitive bidding" in 1954, when Congress enacted the express statutory requirement that federally funded highway contracts be "awarded by competitive bidding." Finally, we address why language added to section 112(b) in 1968 to address the imposition of additional contract requirements after the end of the bidding process does not affect the meaning of "competitive bidding."

## A.

In our view, the phrase "competitive bidding" in section 112(b)(1) is best read to impose both procedural and substantive requirements. Section 112(b)(1)'s requirement that contracts be "awarded by competitive bidding" must be read in the context of section 112 as a whole. The statute's text is focused on "securing competition," 23 U.S.C. § 112(a), on "cost effective[ness]," *id.* § 112(b), and on preventing "any action in restraint of free competitive bidding," *id.* § 112(c). It is difficult to reconcile section 112's evident and overriding focus on the efficient use of federal funds with a reading of its "competitive bidding" requirement that is purely procedural and thus indifferent to state or local restrictions that would shrink the pool of bidders for reasons unrelated to cost or efficiency.

The substantive dimension of the statute's competitive bidding requirement is particularly apparent when its text is considered in the context of its drafting history. Congress's commitment to competitive bidding for federally assisted

---

[5] Although *City of Cleveland* acknowledged that the Administrator would have discretion to disapprove of bidding specifications based on a judgment that they are not "consistent with the overall goals of the [Federal-Aid Highway Program]," 508 F.3d at 842, the court's dicta suggested that, consistent with section 112(b)(1), the Administrator could approve contract specifications that limit the pool of potential bidders for reasons unrelated to the performance of the contract, so long as the procedure of competitive bidding was followed. *Id.* at 841; *see also Bldg. & Constr. Trades Dep't v. Allbaugh*, 172 F. Supp. 2d 138, 161–62 (D.D.C. 2001) (in obligating the Secretary of Transportation to "require such plans and specifications and such methods of bidding as shall be effective in securing competition" in section 112(a), Congress was "clearly discussing the procedures for bid submission, and not the substantive requirements that a State may impose upon prospective bidders"; substantive requirements that bidders must fulfill are addressed in section 112(b)(1), and there "Congress explicitly *permitted* such requirements as long as they are lawful and bidders are given sufficient notice") (emphasis in original), *rev'd on other grounds*, 295 F.3d 28 (D.C. Cir. 2002).

highway construction projects—and Congress's understanding of what "competitive bidding" requires—can be discerned in the historical evolution of the statutory regime that culminated in 23 U.S.C. § 112, in substantially its current form, in the 1950s. In 1938, Congress amended the Federal-Aid Road Act of 1916, ch. 241, 39 Stat. 355, to adopt the precursor to what is now section 112(a). That statute required that the Secretary of Agriculture (then the agency head with authority to approve federally funded highway projects) approve, in connection with federally aided highway construction projects, "only such methods of bidding and such plans and specifications of highway construction for the type or types proposed as will be effective in securing competition and conducive to safety, durability, and economy of maintenance." Pub. L. No. 75-584, § 12, 52 Stat. 633, 636 (1938). As evidenced in the legislative history, Congress contemplated that this addition would promote "open competition in bidding." H.R. Rep. No. 75-2094, at 7 (1938) (using the heading "open competition in bidding" to describe the amendment); 83 Cong. Rec. 6385 (1938) (statement of Rep. Whittington) (the provision "says that there shall be competitive bidding" and that "all bids will be on an equal footing and that all bidders will be given equal treatment"). That history also suggests that Congress contemplated that the agency head with authority to approve federally funded highway projects would exercise a gate-keeping function in determining whether projects adequately provided for competitive bidding, with the result that "only plans, specifications, and methods that provide for competition will be approved." 83 Cong. Rec. 6385 (statement of Rep. Whittington).

Congress made those purposes even clearer in 1954, when it amended the statute to add the precursor to what is now section 112(b)(1). The new section provided:

> Highway construction work performed in pursuance of agreements between the Secretary of Commerce and any State highway department which requires approval by the Secretary of Commerce and which is financed in whole or in part by funds authorized under this or succeeding Acts, shall be performed by contract awarded by competitive bidding under such procedures as may by regulations be prescribed by the Secretary of Commerce, unless the Secretary of Commerce shall affirmatively find that, under the circumstances relating to a given project, some other method is in the public interest. All such findings shall be reported promptly in writing to the Committees on Public Works of the Senate and the House of Representatives.

Federal-Aid Highway Act of 1954, Pub. L. No. 83-350, § 17(a), 68 Stat. 70, 75 (1954). At the same time, Congress instructed that in any case in which the Secretary of Commerce approved highway construction work, the Secretary had to require as a condition precedent "a sworn statement," executed by or on behalf of

the person or entity to which such contract is to be awarded, "certifying" that such person or entity "has not, either directly or indirectly, entered into any agreement, participated in any collusion, or otherwise taken any action in restraint of free competitive bidding in connection with such contract." *Id.* § 17(b), 68 Stat. at 75 (codified at 23 U.S.C. § 112(c)).

The legislative history of the 1954 Act underlines that Congress adopted the more specific language requiring competitive bidding and the "sworn statement" requirement to eliminate collusion and obstacles to free competitive bidding. The Senate committee report accompanying the legislation, for example, explained that the committee adopted section 17 "to prohibit collusion or any other action in restraint of free competitive bidding in connection with any contract for highway construction work performed by cooperative agreements between the Secretary and any State highway department requiring approval by him and financed wholly or in part by funds authorized in this or succeeding acts." S. Rep. No. 83-1093, at 14 (1954), *reprinted in* 1954 U.S.C.C.A.N. 2162, 2175; *see also* 100 Cong. Rec. 5124 (1954) (statement of Sen. Gore) (praising the provision as doing "a great deal to restrain what . . . amounts to a widespread practice of kickbacks of certain portions of the funds under highway contracts, collusion in restraint of free competitive bidding, and other malpractices"). Significantly, Congress also adopted section 17 to promote the most efficient use of federal funds. As the Chairman of the Senate Subcommittee on Public Roads emphasized in the floor debate: "The committee felt it was only proper that competitive bidding should be required in order to obtain the maximum number of roads in quality and quantity for the dollars spent." 100 Cong. Rec. 4671 (1954) (statement of Sen. Case).

In 1958, Congress amended and codified in 23 U.S.C. § 112(a) and (b) the above provisions from the 1938 and 1954 Acts. The revised sections provided:

> (a) In all cases where the construction is to be performed by the State highway department or under its supervision, a request for submission of bids shall be made by advertisement unless some other method is approved by the Secretary. The Secretary shall require such plans and specifications and such methods of bidding as shall be effective in securing competition.

> (b) Construction of each project, subject to the provisions of subsection (a) of this section, shall be performed by contract awarded by competitive bidding, unless the Secretary shall affirmatively find that, under the circumstances relating to such project, some other method is in the public interest. All such findings shall be reported promptly in writing to the Committees on Public Works of the Senate and the House of Representatives.

Pub. L. No. 85-767, § 112(a) & (b), 72 Stat. 885, 895 (1958). In addition, section 112(d) barred states and localities from entering into a contract awarded by competitive bidding pursuant to section 112(b) "without compliance with the provisions of this section, and without the prior concurrence of the Secretary in the award thereof." *Id.* § 112(d), 72 Stat. at 895. Both the accompanying House and Senate committee reports clarified that the bill would place in one enactment "a clear, concise, up-to-date version of all the existing Federal highway laws in an orderly and logical arrangement," and that the bill was "not intended to change any of the fundamental and underlying concepts of existing Federal highway legislation or to make any changes of real substance." H.R. Rep. No. 85-1938, at 2 (1958); S. Rep. No. 85-1928, at 2 (1958); *see also* H.R. Rep. No. 85-1938, at 40 (confirming that the new section 112 derives from section 12 of the 1938 Act and section 17(a) of the 1954 Act); S. Rep. No. 85-1928, at 42 (same).

It is difficult to reconcile this history with a characterization of section 112's "competitive bidding" requirement as imposing a purely procedural constraint. Instead, Congress envisioned from the start that the head of the responsible federal agency (a designation that has changed over time) would ensure that state and local conditions on bidding would not impede competition and would decline to approve federally aided highway construction contract awards when federal competitive bidding requirements were not met. The current text of the statute supports this view. Section 112 mandates that the agency head, now the Secretary of Transportation, "require" "such plans and specifications and such methods of bidding as shall be effective in securing competition." 23 U.S.C. § 112(a). The statute further instructs that construction of each project "be performed by contract awarded by competitive bidding," unless the Secretary makes an exception. *Id.* § 112(b)(1); *see infra* note 14 (discussing the grounds for an exception). Finally, under the statute, the Secretary must concur in the decision to award any federally funded highway contract, 23 U.S.C. § 112(d), and must receive, as a condition precedent to that approval, a sworn statement certifying that the person or entity to whom a contract is to be awarded "has not . . . entered into any agreement, participated in any collusion, or otherwise taken any action in restraint of free competitive bidding in connection with such contract," *id.* § 112(c). *See also Glasgow, Inc. v. FHWA*, 843 F.2d 130, 135 (3d Cir. 1988) (emphasizing the four instances in section 112 "in which Congress references the Secretary's obligation to ensure competitive bidding").

## B.

Section 112(b)(1)'s requirement that federally funded highway contracts be "awarded by competitive bidding" must also be interpreted in light of the prevailing understanding of the concept of "competitive bidding" when Congress added that language to federal-aid highway requirements in 1954. "Competitive bidding" was not a novel concept when Congress enacted the Federal-Aid Highway Act of

1954. Instead, it was the subject of judicial rulings in federal and state courts, bid-protest decisions rendered by the Comptroller General, and widely cited treatises. These sources together confirm that the requirement of competitive bidding was understood then, as it is now, to have a substantive component, rendering invalid those bidding specifications that unduly restrict competition among potential responsible bidders.[6] Nothing in the legislative record suggests that in requiring competitive bidding in awards of federally aided highway construction contracts, Congress intended to depart from this general understanding.

A 1954 opinion of the U.S. Court of Appeals for the Ninth Circuit exemplifies this prevailing understanding. As the Ninth Circuit explained, "[t]he object of competitive bidding is to invite competition, by allowing all persons having the ability to furnish the supplies or materials or to perform the work to compete freely without any unreasonable restrictions." *Gamewell Co. v. City of Phoenix*, 216 F.2d 928, 933 (9th Cir. 1954), *amended on other grounds*, 219 F.2d 180 (9th Cir. 1955). Significantly, contract specifications "must be free of provisions, the effect of which would stifle competition." *Id.* at 934. Applying this rule, the court found a city contract invalid because the specifications called for certain equipment manufactured by only one bidder, such that "real competitive bidding was impossible." *Id.* at 937.

Like *Gamewell*, state courts and the authors of widely-cited treatises at that time also understood unduly restrictive requirements to be at odds with competitive bidding. *Gamewell* cited a leading treatise for the proposition that the object of competitive bidding was to invite competition without unreasonable restriction. *See Gamewell*, 216 F.2d at 933 (citing 10 Eugene McQuillin, *The Law of Municipal Corporations* § 29.44 (3d ed. 1950) ("McQuillin")). That treatise pronounced then, as it does now: "The request for bids must not unduly restrict competition." 10 McQuillin § 29.44, at 297; *accord* 10 McQuillin § 29:48, at 536 (3d rev. ed. 2009) (same); 43 Am. Jur., *Public Works and Contracts* § 51, at 794 (1942) ("The terms and conditions upon which bids may be asked are subject to the limitations that they must not be such as to prevent or restrict full and free competition . . . ."); *see also id.* § 35, at 777 ("terms and conditions" "should contain nothing that would otherwise prevent or restrict full and free competition"). As McQuillin elaborated: "A law demanding competition in the letting of public work is

---

[6] A responsible bidder is one who has "the ability to respond by the discharge of the contractor's obligation in accordance with what may be expected or demanded under terms of a contract. The lowest responsible bidder . . . must be held to imply skill, judgment and integrity necessary to the faithful performance of the contract, as well as sufficient financial resources and ability." 10 Eugene McQuillin, *The Law of Municipal Corporations* § 29.73, at 353 (3d ed. 1950) (internal quotation marks omitted); *see also* Henry A. Cohen, *Public Construction Contracts and the Law* 80 (1961) ("The expression 'lowest responsible bidder' . . . means the lowest bidder whose offer best responds in quality, fitness, and capacity to the particular requirements of the proposed work."); *Picone v. City of New York*, 29 N.Y.S.2d 539 (N.Y. Sup. Ct. 1941) (the term "lowest responsible bidder" "implies skill, judgment and integrity as well as sufficient financial resources").

intended to secure unrestricted competition among bidders, and hence, where the effect of an ordinance is to prevent or restrict competition and thus increase the cost of the work, it manifestly violates such law and is void . . . .”). 10 McQuillin § 29.48, at 303–04 (3d ed. 1950). It was also well established in state courts by the 1950s that contracting authorities following competitive bidding principles must not impose restrictions that stifle competition. *See id.* at 297–98 (citing cases); *see also, e.g.*, *Prescott Courier, Inc. v. Moore*, 274 P. 163, 166 (Ariz. 1929); *Wilmington Parking Auth. v. Ranken*, 105 A.2d 614, 631–35 (Del. 1954); *Weiss v. Town of Woodbine*, 289 N.W. 469, 474–75 (Iowa 1940); *Miller v. City of Des Moines*, 122 N.W. 226, 230 (Iowa 1909); *Jackson v. Sullivan*, 124 S.W.2d 1019, 1021–22 (Ky. 1939); *Ledwith v. City of Lincoln*, 193 N.W. 763, 764–65 (Neb. 1923).[7]

Necessarily, of course, “[a]ll specifications restrict competition since they narrow the range of acceptable bids.” 1B John Cosgrove McBride et al., *Government Contracts: Cyclopedic Guide to Law, Administration, Procedure* § 10.50[1], at 10-164 (2012). The question is whether a particular bidding specification “unduly” restricts competition. *Id.* at 10-166; *see also To the Elgin Sweeper Co.*, 43 Comp. Gen. 680, 682 (1964) (legal question is whether the specification was “unduly restrictive, i.e., restrictive to the point of preventing the pecuniary benefits which we believe to flow from free and open competition”). The notion that specifications that “unduly restrict” competition are inconsistent with competitive bidding requirements has long been a background principle informing government contracts law, as reflected in bid-protest decisions by the Comptroller General. In the 1950s (as is the case now), for example, the Comptroller General, in deciding bid protests under direct federal procurement laws, deemed it within his purview “to determine whether specifications as written are unduly restrictive of competition,” while emphasizing that the inability or unwillingness of a particular bidder

---

[7] To be sure, McQuillin in 1950 recognized that the authorities “may, without violating the rule requiring freedom of competition, insert proper conditions in their proposals for bids, and the bidders are bound to observe them,” 10 McQuillin § 29.44, at 298 (3d ed. 1950), but the examples provided related to the nature of the work to be performed and the bidder’s capability of performing it, such as restrictions as to the kind and quality of the material to be used or requirements that a successful bidder have the requisite plants and facilities for doing the job, rather than conditions unrelated to the project or the contractor’s capability of performing it. *See id.*

We note that the consistency with state competitive bidding laws of specifications and conditions that promote social policy goals not directly related to the needs of the project has been the subject of considerable disagreement among state courts and federal courts applying state law. *Compare, e.g.*, *Domar Elec., Inc. v. City of Los Angeles*, 885 P.2d 934 (Cal. 1994) (city could require bidders to comply with subcontractor outreach program), *and Court Street Steak House, Inc. v. County of Tazewell*, 643 N.E.2d 781 (Ill. 1994) (county jail food supply contract could be awarded to higher bidder who would provide food service training for mentally handicapped), *with Council of City of New York v. Bloomberg*, 846 N.E.2d 433 (N.Y. 2006) (city law requiring contractors to provide domestic partner benefits to employees violated competitive bidding requirements), *and Tex. Hwy. Comm’n v. Tex. Ass’n of Steel Importers, Inc.*, 372 S.W.2d 525 (Tex. 1963) (Texas Highway Commission order requiring construction contracts to require that materials be manufactured in the United States violated competitive bidding law); *see also infra* pp. 20–22 (citing additional cases).

to meet the minimum requirements will not be a sufficient reason to conclude that specifications unduly limit competition. *To York Corp.*, 36 Comp. Gen. 251, 252 (1956); *see also To the Postmaster General*, 32 Comp. Gen. 384, 386 (1953) (questioning the restrictiveness of specifications that appeared to have been drawn with reference to a particular company's sweeper and "in such a manner as to preclude all other companies from submitting responsive bids thereunder").[8] To be sure, the Comptroller General bid protests tended to focus on whether bidding specifications were too rigid in technical respects—e.g., whether specifications requiring a desk with "sandwich construction" were too restrictive, *see To the Secretary of the Navy*, 48 Comp. Gen. 345, 346–49 (1968) (yes)—rather than on whether bidders were being excluded categorically on the basis of other legal requirements. That focus was partly attributable to the era, and partly to the fact that most bid protests addressed by the Comptroller General involve direct federal procurement, which is subject to detailed regulation. Moreover, Congress, unlike local governments subject to federal or state competitive bidding requirements, may enact legal restrictions on competitive bidding, and such restrictions will not be subject to challenge in bid protests before the Comptroller General. The key point, for present purposes, is that the Comptroller General, like federal and state courts, undertook a substantive review of whether bidding specifications were unduly restrictive.[9]

---

[8] *Accord To Control Corp.*, 33 Comp. Gen. 586, 588 (1954) (observing that "the law requiring advertising for bids and award of contracts to the lowest responsible, *responsive* bidder . . . contemplates fair and unrestricted competition" but that the fact that a particular bidder may be unable or unwilling to meet the minimum requirements for supplying the needs "will not be sufficient to warrant the conclusion that the specifications are unduly restricted") (emphasis in original); *To the Secretary of the Interior*, 33 Comp. Gen. 567, 570 (1954) (because qualifying language of stated minimum requirements left bidders in doubt as to whether it would be permissible not to meet those minimums, the specifications were "legally defective" as being "unduly restrictive of competition"; proper course was to advertise "on the basis of specifications which will permit the broadest field of competition within the actual minimums required"); *To the Chairman, Atomic Energy Comm'n*, 30 Comp. Gen. 368, 370 (1951) (determining that the challenged specifications, while potentially eliminating particular bidders who might be unable to meet the minimum requirements for supplying an agency's needs, were not "unduly restrictive" to "the point of precluding free and open competition").

[9] We also note that regulations implementing the Federal-Aid Highway Program have long authorized the responsible agency head or delegee to disallow state or local procedures or requirements that restrict competition. *See, e.g.*, 23 C.F.R. § 635.110(b) (2012) ("No procedure or requirement for bonding, insurance, prequalification, qualification, or licensing of contractors shall be approved which, *in the judgment of the Division Administrator*, may operate to restrict competition, to prevent submission of a bid by, or to prohibit the consideration of a bid submitted by, any responsible contractor . . . .") (emphasis added); *see also supra* note 4. Nearly identical variations of this provision date back to at least 1951. *See* 25 Fed. Reg. 4162, 4163 (1960) (23 C.F.R. § 1.16); 22 Fed. Reg. 1063, 1065 (1957) (23 C.F.R. § 1.10(d)); 16 Fed. Reg. 387, 389 (1951) (23 C.F.R. § 1.10(d)).

## C.

Finally, we explain our view that the language added to section 112(b) in 1968, and cited by the Sixth Circuit in *City of Cleveland*, does not show that section 112(b)'s competitive bidding requirement is merely procedural. The Sixth Circuit's conclusion in dicta to the contrary rested, in part, on the last sentence of section 112(b)(1): "No requirement or obligation shall be imposed as a condition precedent to the award of a contract to such bidder for a project, or to the Secretary's concurrence in the award of a contract to such bidder, unless such requirement or obligation is otherwise lawful and is specifically set forth in the advertised specifications." 23 U.S.C. § 112(b)(1), *quoted in City of Cleveland*, 508 F.3d at 841. The court compared subsection (b)(1)'s reference to a "requirement or obligation" imposed upon contractors with the reference to competitive bidding as a "method" in its first sentence. Based on this contrast, the court concluded that the public body awarding a contract need not justify the "requirements or obligations" imposed on contractors as "more cost effective" than competitive bidding or as necessitated by an emergency, because the need for such showings is triggered only when the public body seeks to depart from competitive bidding as the "method" for awarding a contract. *Id.* Thus, the court reasoned, section 112(b) "confers no authority upon the FHWA to evaluate substantive contract requirements to determine whether they might inhibit competition or disqualify otherwise qualified bidders." *Id.*

This reading of the text of section 112(b)(1), however, overlooks that the last sentence of this provision was added in 1968—years after Congress enacted the requirements in 1938, 1954, and 1958 that the Secretary "require such plans and specifications and such methods of bidding as shall be effective in securing competition," 23 U.S.C. § 112(a), and that federally aided highway construction contracts be "performed by contract awarded by competitive bidding," *id.* § 112(b)(1). *See supra* Part II.A (quoting earlier versions of the Act).[10] Neither the text of the 1968 amendment nor its legislative history supports the conclusion that by adding this language, Congress intended to inject into the statute a new

---

[10] The 1968 amendment added the following two sentences to what was then subsection (b):

> Contracts for the construction of each project shall be awarded only on the basis of the lowest responsive bid submitted by a bidder meeting established criteria of responsibility. No requirement or obligation shall be imposed as a condition precedent to the award of a contract to such bidder for a project, or to the Secretary's concurrence in the award of a contract to such bidder, unless such requirement or obligation is otherwise lawful and is specifically set forth in the advertised specifications.

Federal-Aid Highway Act of 1968, Pub. L. No. 90-495, § 22(c), 82 Stat. 815, 827 (1968). The amendment also added a new section 140 (Equal employment opportunity), which obligated the Secretary to require that each state "include in the advertised specifications, notification of the specific equal employment opportunity responsibilities of the successful bidder." *Id.* § 22(a), 82 Stat. at 826 (codified at 23 U.S.C. § 140(a) (2006)).

distinction between the "method" or "process" of competitive bidding, on the one hand, and substantive "requirements or obligations" imposed on contractors, on the other. Nor did Congress add the last sentence to suggest that "any requirement or obligation" must be accepted by FHWA so long as it is "otherwise lawful" and "specifically set forth in the advertised specifications."

Apart from adding the last two sentences of what is now section 112(b)(1), the 1968 amendment did not amend the text of either section 112(a) or (b), leaving unchanged the pre-existing requirements that the Secretary "require such plans and specifications and such methods of bidding as shall be effective in securing competition" in subsection (a), and that federally assisted contracts be "awarded by competitive bidding" in subsection (b)(1). For the reasons discussed above in Part II.A–B, we think that Congress, in enacting these earlier provisions, intended the statute's competitive bidding requirement to have a substantive dimension empowering the responsible agency head (or delegee) to ensure that state and local bidding specifications and conditions adhere to competitive bidding principles and do not unduly restrict competition.

The 1968 amendments were not intended to alter this authority. Rather, the 1968 amendments are better understood to address only one particular axiom of competitive bidding—that a requirement or obligation not be imposed as a condition precedent to the award of a contract, or to the Secretary's concurrence in the award, "unless such requirement or obligation is otherwise lawful and is specifically set forth in the advertised specifications." 23 U.S.C. § 112(b)(1). The legislative history reflects that this language, paraphrased from a Comptroller General opinion requested by a member of Congress, was added to the statute to address a specific problem. As the congressional committee reports explain, the two sentences were added in response to the Department of Labor's effort to compel contractor compliance with equal employment opportunity requirements imposed by Executive Order 11246 of September 24, 1965, 3 C.F.R. 167 (1965 Supp.), by negotiating such requirements with contractors *after* they had been determined to be the lowest responsive bidders but *before* the contracts were awarded.[11] Congress found the Department of Labor's approach problematic because it added "grave uncertainty about the exact nature of the legal obligation and requirements which may be imposed upon the low bidder on Federal-aid

---

[11] According to congressional committee reports, the Department of Labor was evaluating individual contractors' compliance with these requirements on a contract-by-contract basis for each highway project, after the low bidder on a federal-aid construction contract was determined but before the award to the low bidder was made. S. Rep. No. 90-1340, at 16 (1968), *reprinted in* 1968 U.S.C.C.A.N. 3482, 3497; *see also* H.R. Rep. No. 90-1584, at 13 (1968); *id.* at 51 (minority views). The Labor Department required the low bidder to submit an "acceptable affirmative action program" for the employment of members of minority groups, but the advertised specifications contained no detailed description of what would be considered an acceptable program. Instead, the acceptability of the program was left to negotiation after the bids were opened but before the contract was awarded. H.R. Rep. No. 90-1584, at 51.

highway projects." S. Rep. No. 90-1340, at 16 (1968), *reprinted in* 1968 U.S.C.C.A.N. 3482, 3497; *see also* H.R. Rep. No. 90-1584, at 13 (1968) ("No State can expect to conduct competitive bidding unless it is able to say, when it advertises for bids, what the requirements of the contract will be. No contractor can be expected to bid responsively unless he knows, when he prepares his bid, what the contract will require of him."). To address this concern, the 1968 amendments prohibited any requirements except those "specifically set forth in the advertised specifications," drawing on language from a Comptroller General letter describing the obligation to set forth the "specific and definite minimum require-ments" of a contract in the invitation to bid.[12]

As both the statute's text and history show, Congress adopted the 1968 amendments to require that the Secretary comply with what Congress and the Comptroller General understood to be a basic principle of competitive bidding—that a contract award be made only on the basis of the lowest responsive bid submitted by a bidder meeting established criteria of responsibility, including any specific and definite requirements set forth in advance in the advertised specifica-tions. With this amendment, Congress declared out of bounds the conditioning of a federally funded contract award on a requirement or obligation that has not been specifically set forth in the advertised specifications or is not otherwise lawful. But Congress did not amend and did not intend to significantly alter the meaning of the preexisting portions of section 112(b) to *permit* unduly restrictive state and local specifications so long as they are otherwise lawful and advertised in advance. Apart from codifying that one specific principle of competitive bidding, the 1968 amendment does not change FHWA's required determinations that the plans and specifications of the state or local contracting authority are "effective in securing

---

[12] Representative William Cramer asked the Comptroller General if the Department of Labor's approach violated the competitive bidding requirements of the federal-aid highway laws. In a letter opinion, the Comptroller General responded that "the basic principles of competitive bidding require that bidders be assured that award will be made only on the basis of the low responsive bid submitted by a bidder meeting established criteria of responsibility, including any additional specific and definite requirements set forth in the invitation, and that award will not thereafter be dependent upon the low bidder's ability to successfully negotiate matters mentioned only vaguely before the bidding." *To Rep. William C. Cramer*, 47 Comp. Gen. 666, 670 (1968), *quoted in* H.R. Rep. No. 90-1584, at 51, *and* 114 Cong. Rec. 19,398–99 (1968) (statement of Rep. Cramer); *see also* H.R. Rep. No. 90-1584, at 13 (citing Comptroller General opinion); S. Rep. No. 90-1340, at 17 (same), *reprinted in* 1968 U.S.C.C.A.N. at 3498. Consequently, the Comptroller General concluded that the Department of Labor could require bidders to submit affirmative action programs before contract awards were made only if the agency issued regulations that included a statement of definite minimum requirements to be met by the bidder's program and any other standards or criteria by which the acceptability of the program would be judged. 47 Comp. Gen. at 670. Concerned that the Department of Labor was not complying with the Comptroller General opinion, H.R. Rep. No. 90-1584, at 51, and believing that equal opportunity requirements should be "work[ed] out in advance," *id.* at 13, the House committee adopted an amendment to section 112 "to incorporate the effect of this ruling of the Comptroller General into the Federal-aid highway laws, to require resolution of the problem of equal employment programs before the bidding." *Id.* at 51 (minority views); *see also id.* at 13; H.R. Rep. No. 90-1799, at 34 (1968) (Conf. Rep.) (adopting House version of amendment), *reprinted in* 1968 U.S.C.C.A.N. 3531, 3540.

competition" and comply with the requirements of "competitive bidding," 23 U.S.C. § 112(a) & (b)(1).

\* \* \* \* \*

For these reasons, and consistent with our 1986 opinion, we believe that section 112(b)(1)'s requirement of "competitive bidding" for federally assisted highway construction contracts not only describes a procedural method for awarding contracts, but also contains a substantive component that would render some conditions imposed by state or local governments impermissible (even if the conditions are announced in advance and are otherwise lawful).

### III.

There remains the question of the scope and nature of the substantive limitation that section 112(b)(1) imposes on state or local bidding restrictions unrelated to performance of the necessary work. As explained below, we do not think that the requirement that contracts be "awarded by competitive bidding" precludes any and all state and local bidding requirements that might reduce the pool of eligible, responsible bidders. In our view, FHWA retains some discretion under the statute to evaluate whether a particular state or local law or policy that has more than an incidental effect on the pool of potential bidders is nonetheless compatible with section 112(b)(1)'s competitive bidding requirement.[13] *See generally Rothrock v. United States*, 62 F.3d 196, 198–99 (7th Cir. 1995) (noting the Secretary's broad discretion in approving federal highway projects); *Glasgow*, 843 F.2d at 136 ("The Act, in general, indicates that the FHWA is to have discretion in its administration."). FHWA's exercise of that discretion, however, is constrained by the objectives of the statute: state or local bidding requirements that disadvantage or exclude a class of potential bidders from the pool of applicants for reasons not directly related to the contractors' capability of performing the work are compatible with section 112 only if such requirements advance the purposes of competitive bidding. Accordingly, FHWA may reasonably conclude that a state or local bidding requirement that constricts the pool of potential bidders is nonetheless consistent with section 112 because the requirement advances the purposes of competitive bidding and thus does not *unduly* limit competition. In making that judgment, FHWA may permissibly weigh whether the bidding requirement promotes the efficient and effective use of federal funds in the short or long run, or otherwise safeguards the integrity of the competitive bidding process. It is for

---

[13] Thus, as discussed further below, the assessment of whether any particular state or local law or policy restricting the pool of potential bidders is compatible with section 112 properly belongs to FHWA and DOT. Consequently, we do not address here whether any particular state or local bidding restriction or requirement, including those discussed in the DOT Letter, would be consistent with section 112's competitive bidding mandate.

FHWA and DOT to determine the regulatory approach the agency should take in exercising this discretion and in evaluating whether certain state and local requirements are consistent with the statutory mandates that "plans and specifications and [the] methods of bidding . . . be effective in securing competition" and that bidding be "competitive" unless some other method is "more cost effective" or "an emergency exists." 23 U.S.C. § 112(a) & (b)(1).[14]

It is a truism that promoting the efficient use of federal funds is a central purpose of the competitive bidding requirement in section 112. Consequently, state or local bidding requirements that foster the efficient and effective use of federal funds, either in the short or long term, do not conflict with the competitive bidding requirement of section 112. Thus, we concluded in our 1986 opinion that "[s]ection 112 clearly reflects a congressional judgment that the efficient use of federal funds afforded by competitive bidding is to be the overriding objective of all procurement rules for federally funded highway projects, superseding any local interest in using federal funds to advance a local objective, however laudable, at the expense of efficiency." *Competitive Bidding Requirements*, 10 Op. O.L.C. at 103.[15] Although not addressed in our 1986 opinion, state or local bidding require-

---

[14] Section 112 authorizes the Secretary to approve federally assisted highway contracts that have been let through a method other than competitive bidding if "the State transportation department demonstrates, to the satisfaction of the Secretary, that some other method is more cost effective or that an emergency exists." 23 U.S.C. § 112(b)(1). Thus, a process for letting a contract that includes state or local restrictions that are inconsistent with competitive bidding principles may nonetheless be approved as an alternative method if one of these conditions is met—at least in theory. *See, e.g.*, 23 C.F.R. §§ 635.201–635.205 (prescribing procedures for the performance of federally funded highway construction contracts by a method other than competitive bidding); *see also Competitive Bidding Requirements*, 10 Op. O.L.C. at 105–06 (New York City was required to justify its departure from competitive bidding principles by considerations of cost effectiveness). We find it difficult to envision a situation, however, where FHWA could determine that a process for letting a contract by competitive bidding is not consistent with the substantive requirements of competitive bidding because it includes a state or local restriction that imposes an "undue" limit on competition (reflecting a regulatory determination that the restriction does not promote the efficient use of federal funds or protect the integrity of the process), but where FHWA nonetheless could find that the process is "more cost effective" for purposes of determining that it qualifies for the exception. Instead, as FHWA's regulations recognize, the "cost effectiveness" exception is more meaningful in authorizing complete departures from the method of competitive bidding, such as negotiated contracts or the "force account" method of construction, in which a state transportation department, a county, a railroad, or a public utility company directly performs the highway construction work. *See* 23 C.F.R. § 635.203(b) & (c) (defining the meaning of "*some other method* of construction" as used in 23 U.S.C. § 112(b), and of "*force account*") (emphasis in original).

[15] Our 1986 opinion relied in part on the 1983 amendment to section 112(b), which replaced the public interest exception ("unless the Secretary shall affirmatively find that, under the circumstances relating to such project, some other method is in the public interest") with the current requirement that departures from competitive bidding be justified by a demonstration that the alternative is more cost-effective ("unless the State highway department demonstrates, to the satisfaction of the Secretary, that some other method is more cost effective"). *See* Surface Transportation Assistance Act of 1982, Pub. L. No. 97-424, § 112, 96 Stat. 2097, 2106 (1983). Based in part on this amendment, our 1986 opinion reasoned that Congress had intended that "cost-effectiveness be the only criterion" for awarding contracts for highway projects funded by the federal government, and that Congress had made clear

ments that protect the integrity of the competitive bidding process, and therefore its ability to safeguard the public fisc in the long run, similarly would not conflict with the competitive bidding requirement in section 112.

As described above, over time Congress has adopted amendments to the Act to foster the efficient use of federal funds, as well as to eliminate collusion and other threats to the integrity of the competitive bidding process. *See supra* Part II.A; *see also Mahler v. United States*, 306 F.2d 713, 721 (3d Cir. 1962) (recounting the legislative history of federal-aid highway legislation, with the observation that "[t]he concern of Congress was to make sure that federal funds were effectively employed and not wasted"). One classic description recognizes that the requirements of competitive bidding are "for the purpose of inviting competition, to guard against favoritism, improvidence, extravagance, fraud and corruption in the awarding of municipal contracts, and to secure the best work or supplies at the lowest price practicable." 10 McQuillin § 29.29, at 266 (3d ed. 1950); *see also* 64 Am. Jur. 2d, *Public Works and Contracts* § 28, at 648–49 (2011) ("The purpose of requiring governmental entities to conduct competitive bidding is to eliminate favoritism, fraud, and corruption; to avoid misuse of public funds; and to stimulate advantageous marketplace competition. Such competitive bidding statutes are intended not only to ensure that the awarding authority obtains the lowest price among responsible contractors but also to establish an open and honest procedure for competition for public contracts.").[16]

Case law construing competitive bidding requirements under state and local law is, of course, not binding on FHWA in implementing the competitive bidding mandate of 23 U.S.C. § 112 (and, indeed, courts in different jurisdictions often have reached different conclusions regarding the validity of similar bidding

---

that "the efficient use of federal funds is the touchstone by which the legality of state procurement rules for federally funded highway projects is to be tested." *Competitive Bidding Requirements*, 10 Op. O.L.C. at 105 (citing Surface Transportation Assistance Act of 1982, Pub. L. No. 97-424, 96 Stat. at 2106). Although we continue to believe that the efficient use of federal funds is central not only to the cost-effectiveness exception but also to the core requirements of competitive bidding itself, we now believe that the new language introduced in 1983 changed only the nature of the exceptions justifying a departure from competitive bidding, and not the nature of the competitive bidding requirement itself.

[16] Before Congress added the explicit competitive bidding requirements to the statute in 1954, one treatise explained that honest and effective competition is the means by which the end of securing public contracts at a low cost may be achieved:

> The purposes of [competitive bidding] are to secure economy in the construction of public works and the expenditures of public funds for materials and supplies needed by public bodies, to protect the public from collusive contracts, to prevent favoritism, fraud, extravagance, and improvidence in the procurement of these things for the use of the state and its local self-governing subdivisions, and to promote actual, honest, and effective competition to the end that each proposal or bid received and considered for the construction of a public improvement, the supplying of material for public use, etc., may be in competition with all other bids upon the same basis, so that all such public contracts may be secured at the lowest cost to taxpayers.

43 Am. Jur., *Public Works and Contracts* § 26, at 767 (1942).

restrictions, *see supra* note 7). But this case law illustrates the kinds of analyses that courts use to determine whether state and local restrictions or contract conditions comply with competitive bidding requirements, as well as the background understanding of "competitive bidding." As discussed above, *see supra* Part II.B, courts have long set aside state and local specifications and contract conditions that they consider unduly restrictive under competitive bidding principles. What is particularly instructive are the reasons courts cite in rejecting or sustaining restrictions on eligible bidders unrelated to the capability of the bidder to perform the work in a competent and responsible manner.

For example, many courts have identified protection of the public fisc, by obtaining the best work at the lowest possible price, as one of chief objectives of their states' competitive bidding laws. These courts tend to invalidate state or local bidding restrictions that are not intended to safeguard public funds, even though the restrictions may serve other desirable public policy goals. *See, e.g.*, *Associated Gen. Contractors of Cal., Inc. v. City & Cnty. of San Francisco*, 813 F.2d 922, 926 (9th Cir. 1987) (competitive bidding statutes are designed to protect against "a variety of ills," including "insufficient competition to assure that the government gets the most work for the least money"; invalidating San Francisco ordinance giving preferences to minority-owned, women-owned, and locally-owned business enterprises as inconsistent with city charter requiring contracts to be let "to the lowest reliable and responsible bidder"); *Council of City of New York v. Bloomberg*, 846 N.E.2d 433, 438–39 (N.Y. 2006) (ruling that exclusion of responsible bidders that do not provide domestic partner benefits violates competitive bidding requirements because the purpose and likely effect of the law was not "to make the City's contracts cheaper or their performance more efficient," and the law may open the door to "favoritism" by allowing the city to design its requirements to match the benefit structure of its preferred bidder); *Associated Builders & Contractors, Inc. v. City of Rochester*, 492 N.E.2d 781, 782–83 (N.Y. 1986) (holding city ordinance granting preference to contractors with apprenticeship training programs invalid given competitive bidding statute's "predominate purpose" of "protection of the public fisc"); *Am. Inst. for Imported Steel, Inc. v. Office of Gen. Servs.*, 365 N.Y.S.2d 56, 58 (N.Y. App. Div. 1975) (invalidating "Buy-American" policy as contrary to competitive bidding statute, the purpose of which is "to invite competition" and thereby furnish the state with "the best product at the lowest price practicable," and thus "conserve the taxpayers' money"; this purpose "could easily be neutralized if any group of responsible bidders is wrongfully eliminated"); *Clarkie's, Inc. v. City of Philadelphia*, 67 Pa. D. & C.2d 68, 75, 77–91 (1973) ("Where competitive bidding is required, any ordinance which unduly limits the number of bidders, thus tending to increase the cost of the work, is void"; invalidating proof-of-competency specification requiring prior experience in a stadium, race track, or arena with seating capacity of at least 10,000, for Veterans' Stadium janitorial and maintenance services contract, as an "arbitrary" and "undue restriction on competitive bidding").

On the other hand, where state or local bidding restrictions or contract conditions are intended to promote the efficient use of government funds, courts are more likely to find them consistent with competitive bidding requirements. In *New York State Chapter v. New York State Thruway Authority*, 666 N.E.2d 185 (N.Y. 1996), for example, the New York Court of Appeals considered whether public authorities governed by state competitive bidding laws may lawfully adopt prebid specifications known as Project Labor Agreements ("PLAs") for construction projects, despite their "anticompetitive impact on the bidding process." *Id.* at 188.[17] Reading its past cases as identifying two central purposes of New York's competitive bidding statutes—protection of the public fisc by obtaining the best work at the lowest possible price, and prevention of favoritism, improvidence, fraud, and corruption in the awarding of public contracts—the court held that the public authority bears the burden of showing that a decision to enter into a PLA has "as its purpose and likely effect" the advancement of these interests. *Id.* at 190. Applying this test, the court sustained one PLA requirement in connection with a major bridge construction project, on the ground that the public authority's focus on "the public fisc—both cost savings and uninterrupted revenues" demonstrated that the PLA was adopted in conformity with competitive bidding statutes. *Id.* at 191. The court invalidated a second PLA, however, because of the absence of record evidence regarding projected "cost savings" or "labor unrest" threatening the project, even though the authority's goals of promoting women and minority hiring through the PLA was "surely laudable." *Id.* at 192–94; *accord John T. Callahan & Sons, Inc. v. City of Malden*, 713 N.E.2d 955, 964 (Mass. 1999) (upholding PLA where record reflected that city sought "to obtain the lowest price for its work that the competition among responsible contractors can secure" and where the PLA served to "place[] all general contractors and subbidders on an equal footing in the competition to gain the contract") (citations and internal quotation marks omitted); *see also State ex rel. Associated Builders & Contractors v. Jefferson Cnty. Bd. of Comm'rs*, 665 N.E.2d 723, 727 (Ohio Ct. App. 1995) (sustaining PLA as consistent with competitive bidding laws, the purpose of which is "to enable a public contracting authority to obtain the best work at the lowest possible price while guarding against favoritism and fraud"). *But see George Harms Constr. Co. v. N.J. Turnpike Auth.*, 644 A.2d 76, 79, 95 (N.J. 1994) (holding that PLAs may not be used by state agencies, given "paramount policy"

---

[17] A PLA is a prebid contract between a construction project owner and a labor union establishing the union as the collective bargaining representative for all persons who will perform work on the project. The PLA provides that only contractors and subcontractors who sign the prenegotiated agreement with the union can perform project work. A PLA generally requires all bidders on the project to hire workers through the union hiring halls; follow specified dispute resolution procedures; and comply with union wage, benefits, and other rules. In return for a project owner's commitment to insist in its specifications that all successful bidders agree to be covered by the PLA, the union promises labor peace throughout the life of the contract. *Thruway*, 666 N.E.2d at 188.

of state's public-bidding laws to foster "unfettered competition" in public contracts).

Furthermore, courts have sustained bidding restrictions and contract conditions that are designed to protect the integrity of competitive bidding procedures itself—a process goal that helps ensure fairness to bidders, enhance participation of potential bidders, and ultimately achieve cost savings. To give an obvious example, contracting authorities may reject fraudulent bids. 10 McQuillin § 29.69, at 408 (3d rev. ed. 1966) (citing *People v. Stephens*, 71 N.Y. 527 (1878)). A city requirement that bidders list their subcontractors in their bid proposals has been upheld on the ground that it prevents "bid shopping," thus yielding "the lowest possible cost for the taxpayer, and fairness to bidders and subcontractors." *See C.R. Kirby Contractors, Inc. v. City of Lake Charles*, 606 So.2d 952, 955 (La. Ct. App. 1992). Under section 112 itself, a federally funded highway construction contract may not be approved in the absence of a sworn statement that the grantee has not participated in collusion. 23 U.S.C. § 112(c); *see also Glasgow*, 843 F.2d at 138 (upholding FHWA decision to withhold concurrence in highway contract award because the agency could have found that the state transportation department's renegotiation of the disadvantaged business enterprise participation goal "damaged the integrity of the bidding process" and "was not consistent with 'free, open and competitive bidding'") (quoting 23 C.F.R. § 635.104(a)(1987)). Courts have upheld restrictions designed to open up the competitive bidding process, maximizing the number of potential responsible bidders and thereby securing the best work at the lowest possible price. *See, e.g.*, *Domar Elec., Inc. v. City of Los Angeles*, 885 P.2d 934, 940–41 (Cal. 1994) (upholding good-faith subcontractor outreach program as consistent with competitive bidding requirements, which "necessarily imply equal opportunities to all whose interests or inclinations may impel them to compete at the bidding" and because the city board "could reasonably have concluded that the program will assist the City in securing the best work at the lowest price practicable") (internal quotation marks and citation omitted). And, relevant to the validity of state or local restrictions on political contributions by potential bidders, a New York court, in a widely cited decision, upheld a city board decision to reject the lowest bid, in reliance on a mayoral executive order directing city agencies not to do business with a list of contractors (including the low bidder) who had given gifts to city officials. *Kayfield Constr. Corp. v. Morris*, 225 N.Y.S.2d 507 (N.Y. App. Div. 1962); *see also* 10 McQuillin § 29.69, at 408 (3d rev. ed. 1966) (citing *Kayfield*); *accord* 10 McQuillin § 29:76, at 620 (3d rev. ed. 2009) (same).[18]

---

[18] Federal law also prohibits any person who enters into a contract with the United States or a federal department or agency, at any time between the commencement of negotiations for, and the later of the completion of performance under or the termination of negotiations for, such contract, "directly or indirectly to make any contribution of money or other things of value, or to promise expressly or

Against the backdrop of these conventions in construing competitive bidding requirements, and consistent with the congressional purposes in requiring competitive bidding here, we conclude that section 112 authorizes FHWA to exercise discretion to approve federally funded highway construction contracts—notwithstanding state or local requirements that have more than an incidental impact on the pool of eligible bidders and are unrelated to the necessary work—so long as such requirements, in FHWA's judgment, advance the purposes of this statute and thus do not unduly limit competition. Restrictions that FHWA determines promote the short- or long-term efficient use of federal funds, or protect the integrity of the competitive bidding process itself, do not unduly inhibit competition and need not satisfy one of the exceptions under section 112(b)(1) (although the contract awards remain subject to FHWA's prior concurrence under section 112(d)). In light of the limits on the agency's discretion, however, we believe that FHWA will rarely, if ever, be in a position to conclude that state or local requirements that eliminate or disadvantage a class of responsible bidders (for reasons unrelated to the necessary work) to advance objectives that neither enhance the efficient use of federal funds nor protect the fundamental integrity of the bidding process are compatible with the competitive bidding requirement of section 112.

DOT (and accordingly its delegee FHWA) must establish the process by which the agency will exercise its discretion under section 112. As explained above, in our view, section 112 does not compel FHWA's current position and permits FHWA to authorize state and local requirements that might diminish the pool of potential bidders for a particular contract, provided that the agency concludes that such requirements do not unduly limit competition. FHWA also has discretion to structure an appropriate regulatory process to reach such determinations. For example, the agency could initiate a rulemaking that would enable FHWA to make categorical determinations about the types of state and local bidding conditions that are permissible under the statute or, alternatively, it could initiate a rulemaking that would establish an administrative process through which the agency would make case-by-case assessments about the validity of particular restrictions, outlining the factors the agency would take into account in making such assessments.

## IV.

In sum, we reaffirm the view expressed in our 1986 opinion that "the efficient use of federal funds is the touchstone by which the legality of state procurement rules for federally funded highway projects is to be tested," *Competitive Bidding Requirements*, 10 Op. O.L.C. at 105, but we do not understand section 112's

---

impliedly to make any such contribution to any political party, committee, or candidate for public office or to any person for any political purpose or use." 2 U.S.C. § 441c(a)(1) (2012).

competitive bidding requirement to compel FHWA to reject every state or local bidding specification or contract requirement that may have the effect of reducing the number of potential bidders for a particular contract. Rather, in our view, FHWA may reasonably conclude, consistent with 23 U.S.C. § 112, that certain state or local requirements promote the efficient and effective use of federal funds or protect the integrity of the competitive bidding process either in connection with the particular contract or when considered over the long term—even if the requirements may have the effect of constricting the pool of potential responsible bidders in particular instances. FHWA may establish a regulatory process to determine whether particular state or local bidding restrictions, whether considered as a class or case by case, satisfy the competitive bidding requirements of section 112.

VIRGINIA A. SEITZ
*Assistant Attorney General*
*Office of Legal Counsel*