OPINION OF THE COURT
Chief Judge Kaye.
Can public authorities governed by New York’s competitive bidding laws lawfully adopt prebid specifications known *65 as Project Labor Agreements (PLAs) for construction projects? We conclude that PLAs are neither absolutely prohibited nor absolutely permitted in public construction contracts. A PLA will be sustained for a particular project where the record supporting the determination to enter into such an agreement establishes that the PLA was justified by the interests underlying the competitive bidding laws. Here, that burden was satisfied by the Thruway Authority but not the Dormitory Authority (DASNY).
Project Labor Agreements
By way of background, a PLA is a prebid contract between a construction project owner and a labor union (or unions) establishing the union as the collective bargaining representative for all persons who will perform work on the project. The PLA provides that only contractors and subcontractors who sign a prenegotiated agreement with the union can perform project work. A PLA thus generally requires all bidders on the project to hire workers through the union hiring halls; follow specified dispute resolution procedures; comply with union wage, benefit, seniority, apprenticeship and other rules; and contribute to the union benefit funds. In return for a project owner’s promise to insist in its specifications that all successful bidders agree to be covered by a PLA, the union promises labor peace through the life of the contract (see, Associated Bldrs. & Contrs. v Massachusetts Water Resources Auth., 935 F2d 345, 360 [Breyer, Ch. J., dissenting], read sub nom. Building & Constr. Trades Council v Associated Bldrs. & Contrs. of Mass./R. I., 507 US 218 [the Boston Harbor case]).
By comprehensively requiring all bidders to conform to a variety of union practices and limiting their autonomy to negotiate employment terms with a labor pool that includes nonunion workers — attributes that, by their scope, set these agreements apart from more common specifications, like construction materials or design criteria — PLAs have an anticompetitive impact on the bidding process (see, 207 AD2d 26, 30; Harms Constr. Co. v New Jersey Turnpike Auth., 137 NJ 8, 44, 644 A2d 76). Because in particular instances there are, however, also efficiencies to be gained, PLAs have been utilized in major construction projects such as the Boston Harbor (Boston Harbor, 507 US 218, supra), the Cleveland sports complex (Northern Ohio Ch. of Associated Bldrs. & Contrs. v Gateway *66 Economic Dev. Corp., 1992 WL 119375 [US Dist Ct, ND Ohio]) and the Massachusetts Central Artery/Third Harbor Tunnel (Utility Contrs. Assn. v Department of Pub. Works, 29 Mass App Ct 726, 565 NE2d 459 [1991]).
The backdrop for the present appeals is the United States Supreme Court decision in Boston Harbor. Recognizing the uniqueness of the construction industry, Congress in 1959 amended the National Labor Relations Act (NLRA) to permit prehire agreements in private construction contracts (29 USC § 158 [f]). At issue in Boston Harbor was whether the NLRA permitted a public authority to require as a prerequisite to the award of a public contract that the winning bidder and its subcontractors abide by a PLA previously negotiated between a labor consultant and the Boston Metropolitan District Building and Construction Trades Council. The Court concluded:
"It is evident from the face of the statute that in - enacting exemptions authorizing certain kinds of project labor agreements in the construction industry, Congress intended to accommodate conditions specific to that industry. Such conditions include, among others, the short-term nature of employment which makes posthire collective bargaining difficult, the contractor’s need for predictable costs and a steady supply of skilled labor, and a longstanding custom of prehire bargaining in the industry. * * *
"There is no reason to expect these defining features of the construction industry to depend upon the public or private nature of the entity purchasing contracting services. To the extent that a private purchaser may choose a contractor based upon that contractor’s willingness to enter into a prehire agreement, a public entity as purchaser should be permitted to do the same.” (Boston Harbor, 507 US at 231 [citations omitted].)
While Boston Harbor stimulated local and State interest in PLAs, that decision held only that Federal labor law does not prohibit a public entity from using the same NLRA exception as is available to private purchasers of construction services. The decision did not go further to resolve the question before us: whether in light of competitive bidding mandates a public entity can enter into a PLA.
Recently, the New Jersey Supreme Court — the first State high court to decide the question — concluded that PLAs were *67 prohibited by that State’s public bidding statutes, which foster "unfettered competition” in public contracts (Harms, 137 NJ at 44, 644 A2d at 95, supra; but see, State ex rel. Associated Bldrs. & Contrs., Cent. Ohio Ch. v Jefferson County Bd. of Commrs., 106 Ohio App 3d 176, 665 NE2d 723 [Ohio a App 1995], appeal dismissed 74 Ohio St 3d 1499, 659 NE2d 314 [1996] [PLA did not violate Ohio competitive bidding statute]). Because we have never construed New York’s competitive bidding statutes to be so absolute, we answer the question differently.
Statutory Framework
New York has a multitude of procurement statutes applicable to public entities, but the underlying purpose is uniform: to assure prudent use of public moneys and to facilitate the acquisition of high quality goods and services at the lowest possible cost (see, e.g., General Municipal Law § 100-a). This Court has several times revisited New York’s requirement for competitive bidding in the disposition of public contracts.
In Gerzof v Sweeney (16 NY2d 206), for example, we reviewed a bid specification of the Board of Trustees of the Village of Freeport on a municipal contract that required experience constructing three generators of a specific type. The requirement had the effect of severely limiting competitive bidding for all but one manufacturer. This Court held that the specification violated General Municipal Law § 103, which provided that all contracts for public works were to be awarded to the lowest responsible bidder:
"We do not mean to suggest that specifications for public projects are illegal merely because they tend to favor one manufacturer over another. More must appear in order to render the specifications and the contract based thereon illegal * * * However, an objectionable and invalidating element is introduced when specifications are drawn to the advantage of one manufacturer not for any reason in the public interest but, rather, to insure the award of the contract to that particular manufacturer. * * * Such a scheme or plan is illegal in the absence of a clear showing that it is essential to the public interest.” (Id. at 211-212.)
Thus, it is manifest from Gerzof that New York’s competitive bidding statutes do not compel unfettered competition, but do *68 demand that specifications that exclude a class of would-be bidders be both rational and essential to the public interest.
In Jered Contr. Corp. v New York City Tr. Auth. (22 NY2d 187, 192-193), we identified the strong public policy behind the competitive bidding statutes as "fostering honest competition in order to obtain the best work or supplies at the lowest possible price. In addition, the obvious purpose of such statutes is to guard against favoritism, improvidence, extravagance, fraud and corruption.” Again, in Matter of Conduit & Found. Corp. v Metropolitan Transp. Auth. (66 NY2d 144, 148), the Court described the purpose of the competitive bidding statutes as promotion of the public interest by "fostering honest competition in the belief that the best work and supplies might thereby be obtained at the lowest possible prices.”
Most recently in Associated Bldrs. & Contrs. v City of Rochester (67 NY2d 854), we found a violation of General Municipal Law § 103 where approximately 50 nonunion contractors challenged a City ordinance providing preferences to bidders whose employees participated in a State-approved apprenticeship program. We struck down the apprenticeship program "precondition” as not linked to the interests embodied in the competitive bidding statutes, regardless of its furtherance of otherwise enunciated public policy (see also, American Inst. for Imported Steel v Office of Gen. Servs., 47 AD2d 118, affd 38 NY2d 991 [requirement that bidders supply only steel manufactured in America invalid because unrelated to the goals of the bidding statutes]; accord, American Inst. for Imported Steel v County of Erie, 32 AD2d 231; Matter of Warren Bros. Co. v Craner, 30 AD2d 437 [requirement that bidders’ asphalt plants be located in Onondaga County invalid]).
Read together, these cases identify two central purposes of New York’s competitive bidding statutes, both falling under the rubric of promoting the public interest: (1) protection of the public fisc by obtaining the best work at the lowest possible price; and (2) prevention of favoritism, improvidence, fraud and corruption in the awarding of public contracts. Generally, when a public entity adopts a specification in the letting of public work that impedes the competition to bid for such work, it must be rationally related to these twin purposes. Where it is not, it may be invalid (Associated Bldrs., 67 NY2d at 855, supra).
As applied particularly to PLAs, which are clearly different from typical prebid specifications in their comprehensive *69 scope, more than a rational basis must be shown. The public authority’s decision to adopt such an agreement for a specific project must be supported by the record; the authority bears the burden of showing that the decision to enter into the PLA had as its purpose and likely effect the advancement of the interests embodied in the competitive bidding statutes. Judicial review, although limited, is not without importance in that it safeguards the interests protected by the competitive bidding mandate. PLAs may not be approved in a pro forma manner.
Mindful of these principles, we turn to the facts before us.
The Thruway Authority Case
Respondent Thruway Authority is a public benefit corporation created by a special act of the Legislature (L 1950, ch 143) and responsible for constructing and maintaining the New York State Thruway (see, Public Authorities Law § 352). In that connection the Authority had charge of a major construction project to improve the Governor Malcolm Wilson (Tappan Zee) Bridge.
Originally opened in 1955, the Tappan Zee Bridge spans the Hudson River between Rockland County on the west and Westchester County on the east. The Bridge carries Interstate Route 87, which extends north and west from Rockland County in the direction of Albany, Canada and Buffalo, and east and south to New England and New York City. Approximately 60,000 toll-paying vehicles flow across the Bridge daily — and tolls are collected only from eastbound trafiic. In 1993, 20,647,930 toll-paying vehicles crossed the Bridge, generating $45,920,519 in revenue for the Thruway Authority.
At issue is a four-year project to refurbish the Tappan Zee Bridge — the largest such construction project since the Bridge was built. A significant portion of the work involves deck replacement, which entails reducing the number of lanes available to trafiic while work is in progress. Thus, the Thruway Authority determined that efficiency in completing the project, once commenced, is important to protect a major revenue-producing asset, maximize public safety, and minimize inconvenience to the traveling public.
Of the 23 major construction projects on the Tappan Zee since it was built, the successful bidder in 20 was a union contractor. In fact, union contractors had performed more than 90% of the total dollar volume of work on the Bridge.
*70 Based on the size and complexity of the pending project, the Thruway Authority predicted that it would be subject to the jurisdiction of some 19 local unions with separate labor contracts having different starting times, scheduling restrictions, holidays, grievance resolution procedures, and other terms and conditions of employment. In 1992, the last time a contract was awarded to a nonunion contractor, the Tappan Zee’s first labor dispute erupted. The dispute required the assistance of the State Police to insure the safety of the contractor’s employees, and the Bridge itself was picketed.
After receiving an August 1993 memorandum from the Governor’s office advising of the Boston Harbor decision and recommending consideration of PLAs for future projects, the Authority retained a consultant to investigate the issue for the Tappan Zee project. Based on concessions won from local unions, uniform scheduling and enhanced flexibility with work shifts, the consultant’s detailed report estimated labor savings if a PLA were adopted of at least $6 million, or 13.51% of the anticipated labor cost for the project. Additionally, with a PLA, the Authority would maximize its ability to maintain toll revenues throughout the construction period. After months of negotiation, an agreement was signed and the Thruway Authority included the PLA in the bid documents
The PLA, which binds anyone working on the project, provides that the signatory unions shall be recognized as the exclusive bargaining representatives of all craft employees working at the project. The agreement incorporates the local collective bargaining agreements of the signatory unions and makes them binding on all successful bidders. It requires that contractors secure a minimum of 88% of their labor through the labor hall referral system (thus allowing contractors to retain up to 12% of their current work force). The PLA, however, prohibits discrimination in referrals on the basis of union affiliation.
Additionally, the PLA requires every employee and contractor, regardless of union affiliation, to pay union dues and contribute to employee benefit funds.. It provides uniform work rules for all trades, establishing standard hours of work per day and per week. Finally, the PLA sets forth mandatory dispute resolution procedures and expressly prohibits strikes or other labor disruptions.
Immediately after the Thruway Authority issued its specifications, including the PLA, for bridge structural steel repairs, *71 appellants (trade organizations representing contractors and suppliers, a contractor, as well as two individuals claiming to represent the interests of taxpayers and tradespersons) commenced a CPLR article 78 proceeding seeking a declaration that the PLA was unlawful and illegal, and an order halting the bidding process. Unions representing the construction trades and an association of unionized construction employers intervened. Adopting the reasoning of New Jersey’s Harms decision, Supreme Court concluded that the "policy of using PLA’s contravenes two of the purposes of [the competitive bidding statutes] in discouraging competition by deterring nonunion bidders, and fostering favoritism by dispensing advantages to unions and union contractors.”
The Appellate Division reversed, dismissed the petition, and declared that the Thruway Authority did not violate competitive bidding requirements: "Assuming that the use of the PLA somehow discourages competition in the bidding process * * * [w]e conclude that the Thruway Authority’s decision to use the PLA at issue in this case is rationally based upon reasons in the public interest promoted by the competitive bidding statutes” (207 AD2d at 30-31). We agree.
Apart from a measure of independence explicitly delegated to the Thruway Authority (see, Public Authorities Law § 359 [1]; see also, Matter of Plumbing, Heating, Piping & Air Conditioning Contrs. Assn. v New York State Thruway Auth., 5 NY2d 420), we note that in adopting a PLA the Authority assessed specific project needs and demonstrated that a PLA was directly tied to competitive bidding goals. Importantly, the PLA cannot be said to promote favoritism or cronyism because the PLA applies whether the successful bidder is a union or nonunion contractor and discrimination against employees on the basis of union membership is prohibited. The fact that certain nonunion contractors may be disinclined to submit bids does not amount to the preclusion of competition we identified in Gerzof as violative of the competitive bidding mandate.
The Thruway Authority’s detailed focus on the public fisc— both cost savings and uninterrupted revenues — the demonstrated unique challenges posed by the size and complexity of the project, and the cited labor history collectively support the determination that this PLA was adopted in conformity with the competitive bidding statutes. Agreeing with the Appellate Division as to appellants’ remaining contentions, we therefore affirm the order upholding the Thruway Authority’s decision to use the PLA for the Tappan Zee project.
*72 The Dormitory Authority Case
At issue here is a PLA adopted by respondent DASNY, a public benefit corporation responsible for the financing and construction of facilities for State agencies and other entities for which the Legislature has given authorization (see, Public Authorities Law § 1677). Among its larger projects is the modernization of the Roswell Park Cancer Institute for the Department of Health, which operates the Institute. The Roswell project contemplated various public works projects on the Institute’s 25-acre campus-like setting spanning a period of five years.
In August 1993, when DASNY received the Governor’s office’s memorandum regarding PLAs, it had already begun renovation and in fact had let several contracts in furtherance of the Roswell project through competitive bidding. After DASNY was approached by representatives of the Buffalo Building Construction Trades Council in the fall of 1993 regarding adoption of a PLA for the Roswell project, DASNY’s Board of Directors discussed the possibility of a PLA, and the reaction was mixed. Among the negative factors noted were that a PLA might raise the over-all cost of the project; the possibility that skilled labor needed in subsequent project phases might not be available through the PLA; and that upstate, 50% or more of public construction work was nonunion. Barely two months later, local unions picketed two open shop contractors working at Roswell Park. Minutes of a subsequent DASNY Board meeting on February 23, 1994 continued to reflect Board skepticism concerning the need for a PLA at Roswell Park, including the observation that a PLA may affect the price of labor adversely, and made no mention of the picketing.
The following month DASNY approached a labor consultant regarding the issue of a PLA for the Roswell Park project. Of "suggested negotiating topics,” none mentioned cost savings as a goal or provided any cost savings projections. The president of the Building and Construction Trades Council of Buffalo then sent a copy of their proposed PLA to DASNY’s Executive Director and requested a meeting. The Executive Director responded that the Authority had not yet made a decision regarding a PLA, noting that
"[ajccess of minorities and women to employment and contract opportunities on this project is a high priority of the Authority. Consequently, if we decide to pursue the negotiation of a project agree *73 ment or request our construction manager to do so, you should know that our decision will be premised on an understanding that the resulting agreement will contain provisions facilitating those opportunities.”
On April 14, 1994, negotiation of a PLA for the Roswell Park project commenced and weeks later the agreement at issue was concluded.
Not unlike the Thruway Authority PLA, DASNY’s PLA made local collective bargaining agreements of each signatory union binding on all successful bidders; signatory unions were to be recognized as the exclusive bargaining representatives of all craft employees working at the project; contractors were required to hire employees exclusively through the local union job referral system (nonunion contractors were permitted to retain one "core” employee, up to a limit of 10, for every employee hired from the union job referral system). Additionally, all employees hired had to pay union dues and contractors were required to make contributions to union employee benefit funds. Where applicable, a contractor’s choice of materials, design, tools or labor-saving devices was limited by local collective bargaining agreements, and the PLA provided uniform work rules for all trades, establishing standard hours of work per day and per week. Lastly, the PLA set forth mandatory dispute resolution procedures, expressly prohibiting strikes or other labor disruptions.
Appellants (seven contractor associations and two general contractors from the Buffalo area) commenced an article 78 proceeding seeking invalidation of the PLA. Supreme Court stayed acceptance of Roswell Park bids while the merits of the petition were considered. Thereafter, the court annulled the PLA as violative of the competitive bidding requirements of State Finance Law § 135 and Public Buildings Law § 8. The . Appellate Division reversed, holding that as in the Thruway Auth. case the PLA at issue did not violate the competitive bidding statutes because a diminution in competition was permissible, its purpose being rationally related to the public interest promoted by competitive bidding. Disagreeing with that application of the governing principles, we now reverse.
Pursuant to Public Health Law § 2420 (read in conjunction with State Finance Law § 127 [2]), contracts involving the Roswell Park project must comply with the requirement in Public Buildings Law § 8 that the awards be made to the lowest *74 responsible and reliable bidder as will best promote the public interest. Additionally, in 1989, the Legislature amended Public Authorities Law § 1680 (2) (a) to require that:
"[A]ny contract undertaken or financed by the dormitory authority for any construction, reconstruction, rehabilitation or improvement of any building commenced after January first, nineteen hundred eighty-nine for the department of health shall comply with the provisions of section one hundred thirty-five of the state finance law.”
State Finance Law § 135 mandates that construction contracts be awarded to the "lowest responsible bidder.”
Notwithstanding these requirements, DASNY, like the Thruway Authority, is a public benefit corporation. And as we noted in Schulz v State of New York (84 NY2d 231, 244) public benefit corporations were devised by the Legislature to separate their administrative and fiscal functions from those of the State in order to protect the State from liability and enable public projects to be carried out with a measure of freedom and flexibility. Thus, DASNY’s status would allow it to adopt a PLA — provided it satisfied its burden of showing that adopting such an agreement was consistent with the principles underlying the competitive bidding statutes. While the range of discretionary authority granted to a public entity is a factor in determining the validity of a particular PLA, that factor is not dispositive here.
What is dispositive is that the record fails to show that DAS-NY’s decision to enter into the PLA had as its purpose the advancement of the interests underlying the competitive bidding statutes.
Glaringly absent from this record is DASNY’s contemporaneous projection of cost savings as a result of a PLA or any unique feature of the project which necessitated a PLA, an exceptional specification in all events. Although the record contains a few paragraphs identifying how costs would increase if project construction were delayed for one to three months, these projections — apparently done by DASNY’s labor consultant in response to the instant litigation — appear in an affidavit submitted to the trial court nearly four months after the PLA was approved. In fact, by the time of the PLA, DASNY had already let up to six contracts through competitive bidding on the project with no evidence of reduced efficiencies. Minutes of the DASNY Board through the winter continued to reflect the Authority’s own doubt that a PLA was needed.
*75 Nor does the record demonstrate labor unrest threatening the project. DASNY’s resolution and Board discussions do not even discuss labor unrest, except to mention it was not a concern. Although there is reference in the record to one incident of labor unrest — coinciding with DASNY’s consideration of a PLA at Roswell Park and ending with the signing of the PLA — that activity was not claimed to have affected work performance. Rather, the record reflects that local groups used the Roswell Park project as an opportunity to lobby for or against a PLA.
Post hoc rationalization for the ágency’s adoption of a PLA cannot substitute for a showing that, prior to deciding in favor of a PLA, the agency considered the goals of competitive bidding. To say that DASNY’s adoption of the PLA is justified simply by its desire for labor stability so that the work will be completed on time is tantamount to wholesale approval of PLAs — every public entity wants its projects completed on time, and public projects are presumptively important to the public. The competitive bidding requirements, however, demand that something more be shown in order to justify the significant restrictions imposed by PLAs.
Moreover, DASNY’s emphasis on its goals of. promoting women and minority hiring through the PLA, although surely laudable, is unrelated to the goals of the competitive bidding statutes and cannot support its adoption of the PLA for this project (see, Associated Bldrs., supra; American Inst. for Imported Steel, supra).
Given the record, the PLA in this instance cannot be sustained.
Response to the Dissent
Placing preclusive preeminence on a policy of free competition, the dissent would prohibit PLAs without specific legislative direction, however strong the showing that for a particular project such an agreement in fact served the public interest. New York law, of course, has never insisted upon unfettered competition in the letting of public contracts (see, at 67-68, supra). And even the New Jersey Supreme Court, which in Harms concluded that its own State’s competitive bidding statutes required unfettered competition, recognized the Thruway Authority PLA as "exemplifying] the exceptional circumstances that could justify recourse to a PLA” (Tormee Constr. v Mercer County Improvement Auth., 143 NJ 143, 149, 669 A2d 1369, 1372).
*76 Nor do PLAs genetically represent a social policy favoring organized labor (dissenting opn, at 83). The Thruway Authority PLA, for example, recognized that the successful bidder need not be a union contractor; it recognized that the unions must comply with the terms of the PLA whether or not the successful bidder was a union contractor; and it prohibited discrimination against prospective employees on the basis of union membership. PLAs that do have as their purpose social policymaking, such as remedying racial and gender bias, will not be sustained (see, e.g., Subcontractors Trade Assn. v Koch, 62 NY2d 422 [set-aside program for locally based enterprises]; Matter of Fullilove v Beame, 48 NY2d 376 [affirmative action plan]).
Furthermore, the dissent’s claim that a PLA’s anticipated cost savings are somehow illusory because "organized labor drives the cost of a project up [and] PLAs bring it back down” (dissenting opn, at 87) has no support in the record. Indeed, the Thruway Authority record shows the contrary: that over the years, under our competitive bidding laws, the successful bidders for Tappan Zee projects overwhelmingly have been union contractors. That a PLA might reduce costs as the result of negotiations with organized labor does not render such savings "illusory.” And since the anticipated savings would be achieved under the PLA whether or not the successful bidder actually is a union contractor, there is no issue of favoritism.
Because PLAs do not genetically constitute policymaking, because some freedom and flexibility have been delegated to public benefit corporations, and because the particular interests embodied in New York’s competitive bidding statutes have long been clearly articulated as standards for agency action, the separation of powers doctrine is not implicated here (dissenting opn, at 91; see, Matter of Citizens For An Orderly Energy Policy v Cuomo, 78 NY2d 398, 410).*
In sum, the Court’s test neither rubber-stamps nor rejects PLAs wholesale. Rather, it looks to the concerns underlying the competitive bidding statutes to ensure that contracting authorities can respond to the challenges of exceptional construction projects while remaining faithful to the protections provided to the public by the competitive bidding laws. II *77 lustrated by two practical applications, the test should enable public project owners to continue to serve the public interest by proceeding effectively at their work sites, instead of litigating in the courts.
Accordingly, the order of the Appellate Division in Matter of New York State Ch. v New York State Thruway Auth. should be affirmed, with costs. The order of the Appellate Division in Matter of General Bldg. Contrs. v Dormitory Auth. of State of N. Y. should be reversed, with costs, and Supreme Court’s judgment reinstated.

 The dissent observes that New York has no analog to the NLRA exemption regarding PLAs (dissenting opn, at 83). The NLRA had invalidated prehire agreements, however, and Congress thus passed an exemption explicitly-allowing PLAs in the construction industry. Since New York never restricted the use of PLAs, there can be no cogent reason why the New York Legislature has to pass similar legislation.