Read, J.
(dissenting). Petitioner Greater Jamaica Development Corporation, formed in 1967 under New York’s former Membership Corporation Law, is organized and operated exclusively for charitable, scientific and educational purposes within the meaning of section 501 (c) (3) of the Internal Revenue *632 Code (26 USC) with a broad remit to improve economic and living conditions in Jamaica, Queens,[1] an aging urban area that had fallen on especially hard times. From the outset of Greater Jamaica’s efforts on behalf of the Jamaica community, it was apparent that the shortage of downtown parking hampered economic revitalization. Accordingly, in 1976 Greater Jamaica applied to the United States Economic Development Administration on behalf of the City of New York (the City) for a grant to construct a new municipal garage. The application was approved, resulting in a $3.4 million grant to the City, which completed construction of a 530-car garage in 1978. The New York City Department of Transportation initially operated this public parking facility.
Over time the garage sunk into a state of disrepair and, consequently, disuse. In 1996, Greater Jamaica purchased it from the City through the New York City Economic Development Corporation (EDC). Two years later, Greater Jamaica formed Jamaica First Parking, LLC as a special-purpose nonprofit entity with the sole purpose of owning and operating parking facilities exclusively “in furtherance of the charitable purposes of the Member [i.e., Greater Jamaica].” In 2001, Jamaica First purchased three additional run-down parking facilities from the City. Then in 2004, Jamaica First bought vacant land from the City and constructed a 410-car public parking garage with a $5 million grant from the City through *633 the EDC.[2] Greater Jamaica matched the grant with $6 million in debt from the proceeds of tax-exempt facility revenue bonds issued by the New York City Industrial Development Agency. This garage was completed in 2006. Greater Jamaica alleges that these “parking facilities, operated efficiently and at below-market prices, are integral to [its] mission of creating and maintaining a viable downtown Jamaica.”
In 2007, the New York City Department of Finance (DOF or the agency) granted Greater Jamaica a full exemption from real property taxes for the five parking facilities (three garages and two lots) (see RPTL 420-a [1] [a], discussed infra). DOF continued to grant the exemption for ensuing tax years until 2011. Then, although the tentative assessment roll for the 2011-2012 tax year, dated January 5, 2011, still listed the full exemption as applicable, DOF suddenly executed an about-face. In a letter dated February 23, 2011, DOF, by its General Counsel, notified Greater Jamaica of its intention to revoke the exemption, beginning with the 2011-2012 tax year. By notice dated February 24, DOF formalized the revocation.
Greater Jamaica, and amici curiae the Lawyers Alliance for New York, the Queens Chamber of Commerce and the Nonprofit Coordinating Committee of New York, Inc., assert that the decision to revoke Greater Jamaica’s real property tax exemption was transparently “political,” pointing to an opinion column in a New York City tabloid, with a dateline of December 3, 2010 (Juan Gonzalez, Queens Garage Company Gets Unusual Tax Exemption for 2,000-Space Parking System, NY Daily News, Dec. 3, 2010, http://www.nydailynews.com/new-york/ queens-garage-company-unusual-tax-exemption-2-000-space- *634 parking-system-article-1.469283). The column’s author lambasted the City for ££dol[ing] out charitable tax exemptions to parking garages” while reportedly ££tak[ing] [them] away from churches”; intimated that the exemption was granted only because of Greater Jamaica’s allegedly close ties to “several major Queens political figures”; and stated that DOF’s spokesman had assured the author that “officials are taking another look at the arrangement” by “reviewing this issue to determine whether these properties are eligible for a charitable property tax exemption.” Whatever prompted DOF’s review and subsequent revocation of Greater Jamaica’s section 420-a (1) (a) exemption, the agency has not justified its determination that as of 2011 the five parcels no longer qualified.
Relevant Law
Pursuant to Real Property Tax Law § 420-a (1) (a), real property is mandatorily exempt from taxation if it satisfies two criteria. First, the property must be owned by a nonprofit corporation or association organized or conducted exclusively for one or more specified purposes (religious, charitable, hospital, educational or moral or mental improvement of men, women or children); second, the property must be used exclusively for carrying out one or more of the enumerated purposes.[3] With respect to both the first (“purpose”) and the second (“use”) criterion, we have interpreted the term “exclusively” to mean “principally” or “primarily” rather than “only” or “solely” (see e.g. Matter of Association of Bar of City of N.Y. v Lewisohn, 34 NY2d 143, 153 [1974]).
We have cautioned that tax authorities and the courts should not interpret the general categories of “charitable, educational and moral or mental improvement” in section 420-a (1) (a) in a way that is “overly narrow” or “so literal and narrow that it defeats the exemption’s settled purpose,” even though, in the first instance, “exemption statutes [are to] be construed strictly against the taxpayer seeking the benefit of the exemption” (Matter of Symphony Space v Tishelman, 60 NY2d 33, 36 *635 [1983]). In Symphony Space itself, we held that a nonprofit’s theater for the performing arts qualified for an exemption pursuant to section 420-a (1) despite a “ ‘commercial patina’ ” created by rentals and the charging of admission fees for performances (id. at 38). And over the years, New York’s courts have considered a wide range of endeavors to fall within the broadly stated categories of purposes specified in section 420-a (1) (a) (see e.g. Mohonk Trust v Board of Assessors of Town of Gar-diner, 47 NY2d 476, 484-485 [1979] [an organization whose primary purpose “is the preservation of wilderness areas” constitutes a “charitable, educational, or mental or moral improvement” purpose under the statute]; Matter of North Manursing Wildlife Sanctuary [City of Rye], 48 NY2d 135, 138 [1979] [land used “as a wildlife sanctuary for birds and small animals” is a charitable use under the statute]; Matter of Adult Home at Erie Sta., Inc. v Assessor & Bd. of Assessment Review of City of Middletown, 10 NY3d 205, 214 [2008] [housing provided to the elderly at below-market rates “is plainly (used for) a charitable purpose” (internal quotation marks omitted)]; Matter of Salvation Army v Town of Ellicott Bd. of Assessment Review, 100 AD2d 361 [4th Dept 1984] [characterizing “work therapy” and “rehabilitation opportunities” as a charitable purpose]; Matter of Farm Sanctuary v Patton, 221 AD2d 67, 69 [3d Dept 1996] [organization which has “the primary purpose . . . (of) the care and maintenance of abandoned and abused farm animals” qualifies as a charitable purpose]; Matter of Plattsburgh Airbase Redevelopment Corp. v Rosenbaum, 101 AD3d 21, 24-25 [3d Dept 2012] [an organization whose “very purpose is to own, maintain, market and sell . . . land to promote economic development” is engaged in and using the land for a charitable purpose]).
The determination of whether real property is used exclusively for an exempt purpose turns on whether its primary use is in furtherance of the organization’s exempt purpose. Property used for purposes that are “reasonably incident” to the organization’s primary purpose qualifies for exemption, a standard the courts have also broadly construed (People ex rel. Watchtower Bible & Tract Socy. v Haring, 8 NY2d 350, 358 [1960]; see e.g. Matter of St. Joseph’s Health Ctr. Props. v Srogi, 51 NY2d 127 [1980] [property used as a residential facility for hospital staff]; Matter of Rudolf Steiner Educ. & Farming Assn. v Brennan, 65 AD2d 868 [3d Dept 1978], lv denied 46 NY2d 709 [1979] [a farm operated by an educational institution]; *636 University Auxiliary Servs. at Albany v Smith, 78 AD2d 959 [3d Dept 1980], affd 54 NY2d 986 [1981] [improved land used to provide services (food services, a bookstore and recreation) to a college community and vacant land owned by the educational institution]).
Finally, where a municipality seeks “ To withdraw a previously granted tax exemption,’ ” we have held that “ The municipality bears the burden of proving that the real property is subject to taxation’ ” (Matter of Lackawanna Community Dev. Corp. v Krakowski, 12 NY3d 578, 581 [2009] [emphasis added], quoting Matter of New York Botanical Garden v Assessors of Town of Washington, 55 NY2d 328, 334 [1982]).
Showing Necessary to Justify Revocation
In 1971, the legislature amended former section 420 (1) of the Real Property Tax Law, which mandated tax exemptions for real property owned by a host of nonprofit organizations, to carve out and place in paragraph (a) (present-day section 420-a [1] [a]) those nonprofits whose real property remained mandatorily exempt; and to create a new paragraph (b) (present-day section 420-b [1] [a]) to specify other categories of nonprofits whose real property municipalities were newly empowered to tax pursuant to duly enacted local legislation (see L 1971, ch 414). Although the categories specified in former section 420 (1) (b) are not exactly the same as those in its present-day counterpart, the statute’s general scheme to qualify for a permissive exemption remains both the same as when first enacted in 1971, and effectively identical to that established by Real Property Tax Law § 420-a (1) (a) to qualify for a mandatory exemption: first, the property must have been owned by a nonprofit corporation or association organized or conducted exclusively for one or more specified purposes (e.g., bible, tract, benevolent, missionary, infirmary, public playground, scientific, literary, bar association, medical society, library, etc.); second, the property must have been used exclusively for carrying out one or more of the enumerated purposes.
Many localities adopted local legislation permitting them to terminate the previously mandatory tax exemptions enjoyed by certain nonprofit organizations in their communities. The litigation that ensued generally called upon the courts to decide whether such a locality had, in fact, properly reclassified a particular nonprofit as qualified only for a permissive exemption. One of our first major cases addressing this aspect of the 1971 *637 legislation involved an arboretum owned by the New York Botanical Garden and located in the Town of Washington in Dutchess County.
After the Botanical Garden acquired the arboretum in 1973, the Town treated the property as exempt from real property taxation. In 1977, however, the Town adopted a local law to exercise its power under the Real Property Tax Law to tax property owned by a nonprofit organization and used for scientific purposes. Acting under this local legislation, the Town restored the arboretum property to the tax rolls on the ground that the Botanical Garden’s primary purpose and the arboretum’s primary use were scientific and research-oriented. The Botanical Garden commenced a CPLR article 78 proceeding to have the arboretum property declared tax-exempt.
In order to resolve the case on the merits, we were first required to determine whether the Botanical Garden or the Town had the burden of proof, and what that burden entailed. We initially observed that while the taxpayer seeking a real property exemption ordinarily bears the burden of proof,
“under the circumstances presented here, in which the municipality, pursuant to its power under [the Real Property Tax Law], is seeking to withdraw a previously granted tax exemption, the municipality bears the burden of proving that the real property is subject to taxation. Thus, the taxing authority must prove that the corporation or association is organized for a purpose only qualifiedly exempt (in this case, a scientific purpose) and that the property is used for such a purpose” (New York Botanical Garden, 55 NY2d at 334-335 [emphases added]).
Proceeding to the merits, we examined the Botanical Garden’s charter, and held that “[g]iven the wide range of purposes for which [the Botanical Garden] is organized, we cannot say that the town has sustained its burden of proving that a scientific purpose predominates, notwithstanding [the Botanical Garden’s] own declarations of its scientific, among other, purposes” (id. at 335). In deciding whether the Botanical Garden was a qualifiedly exempt scientific or a mandatorily exempt charitable entity, we also considered it relevant that “the will provision under which the arboretum property was deeded to [the Botanical Garden] permits such a grant only to ‘a charitable organization’ ” (id. at 335 n).
*638 Next, we determined that the Town had not shown that the arboretum property was primarily used for a purpose that was only qualifiedly exempt (i.e., a scientific purpose). We observed that “the use to which this particular parcel [was] put accomplished] several [absolutely] exempt purposes, including educational, charitable and moral improvement purposes” (id. at 336). Finally, we rejected the Town’s argument that restrictions on public access to the arboretum’s lands “deprive [d] them of a public purpose” (id. at 337).
Importantly, Town taxing authorities did not just wake up one day and decide to reevaluate Botanical Garden’s tax-exempt status. Rather, something objective — a change of law (i.e., chapter 414 of the Laws of 1971 and the local law adopted pursuant thereto) — prompted the reevaluation. Further, the nature of the change in law was such that we were required to decide whether the Town had properly determined that the nonprofit’s purpose and use qualified only for a permissive exemption, or stated another way, no longer qualified for a mandatory exemption.
Although Botanical Garden arose in a particular context— the 1971 amendments to the Real Property Tax Law — we cited it in Lackawanna for the general proposition that a municipality (there, the City of Lackawanna) bore the burden of proof to justify revocation of a nonprofit’s real property tax exemption. We did not articulate any particular test for the courts to apply when deciding that a revocation was not arbitrary; more to the point, we assuredly did not say that once a municipality makes colorable allegations that a nonprofit’s use of real property fails to further an exempt purpose, then the burden shifts back to the nonprofit to establish its entitlement to an exemption (cf. majority op at 624-625). We simply stated conclusorily that “[t]he Lackawanna tax assessor [had] satisfied his burden” (Lackawanna, 12 NY3d at 581). This was an easy conclusion to reach on the record in Lackawanna, though, because the assessor justified his decision on an independent and objective basis — i.e., the New York State Office of Real Property Services (ORPS) Exemption Administration Manual, which clearly indicated that the property was taxable. Indeed, ORPS issued an advisory letter to that effect to an attorney for the City of Lackawanna. And notably, there was a change in use after the exemption was originally granted: the nonprofit acquired the properties between 1981 and 1985, and did not lease to a for-profit corporation until 1993.
*639 Here, the City has not satisfied its burden of proof. First, it has not shown that Greater Jamaica fails to fulfill section 420-a (1) (a)’s “purpose” or “organized or conducted” criterion, unless the majority is willing to go so far as to declare that economic and community development are not “charitable, educational, or mental or moral improvement” purposes within the meaning of Real Property Tax Law § 420-a (1) (a). We have never so held[4] and neither has the Appellate Division (see Plattsburgh Airbase Redevelopment Corp., 101 AD3d at 24-25). Indeed, the majority acknowledges that “there is evidence in the record” that both Greater Jamaica and Jamaica First were “organized or conducted exclusively for” a tax-exempt purpose (majority op at 625 and 629 n 3; see also 631-632, 632 n 1, 632, 633 n 2, supra). As the majority also acknowledges, a nonprofit organization’s section 501 (c) (3) status bears on the overall analysis of whether it is “organized or conducted exclusively for” a tax-exempt purpose within the meaning of section 420-a (1) (a). Accordingly, I now turn to the City’s newly-minted opinion that the parking facilities are not used for Greater Jamaica’s exempt purposes.
The City’s Rationale for Revocation
It has long been the rule that “[j]udicial review of an administrative determination is limited to the grounds invoked by the agency” (Matter of Rizzo v New York State Div. of Hous. & Community Renewal, 6 NY3d 104, 110 [2005] [internal quotation marks omitted]; see also Matter of New York State Ch., Inc., Associated Gen. Contrs. of Am. v New York State Thruway Auth., 88 NY2d 56, 75 [1996] [declining to adopt an agency’s “(p)ost hoc rationalization” (emphasis omitted)]). Thus, the majority improperly considers proof offered by the City in response to the petition in this case (see majority op at 624-625, discussing an affirmation of a City attorney).
Concomitantly out-of-bounds is the City’s explanation, first advanced on appeal, that its decision to grant Greater Jamaica the tax exemption for tax years 2007-2008 through 2010-2011 *640 was simply a “mistake,” or “erroneously awarded in the first instance” (see id. at 624). In any event, the City’s bare assertion of mistake is insufficient to satisfy its burden of proof. As the Appellate Division observed, a municipality may meet its burden to establish that a nonprofit’s real property is subject to taxation “by proving, for example, a change in the law, a change in the use of the property, or that the tax exemption was erroneously awarded in the first instance” (111 AD3d 937, 939 [2013]).
But there must be some objective indication that a revocation on the “erroneously awarded” basis was prompted by something other than a mere change of heart; that is, a prior decision does not become a “mistake” or “erroneous” any time a municipality decides to interpret existing authorities in a different way. Otherwise, the burden of proof has not, in reality, shifted from the nonprofit to the municipality when an exemption is withdrawn. The nonprofit still effectively bears the burden of showing entitlement and, importantly, enjoys no protection from being sandbagged by capricious and unpredictable administrative decisionmaking, which is what Greater Jamaica claims occurred here. Thus, the cases where the Appellate Division referred to exemptions that had been “erroneously awarded” all dealt with an exemption granted despite a particular clear precedent to the contrary; namely, exemptions that contradicted “well settled” law that “ ‘real property . . . being used as a retirement community for “middle-income” elderly does not qualify for a tax exemption under [RPTL] 420-a’ ” (Matter of Quail Summit, Inc. v Town of Canandaigua, 55 AD3d 1295, 1296 [4th Dept 2008], quoting Matter of Greer Woodycrest Children’s Servs. v Fountain, 74 NY2d 749, 751 [1989], and citing Matter of Presbyterian Residence Ctr. Corp. v Wagner, 66 AD2d 998, 999 [1978], affd for reasons stated 48 NY2d 885 [1979]; see also Matter of Pine Harbour, Inc. v Dowling, 89 AD3d 1192 [3d Dept 2011]).
Here, the letter from DOF’s General Counsel indicates merely a change of heart about Greater Jamaica’s entitlement to an exemption. No new factual circumstances are adduced; the only post-2007 case that the General Counsel mentions is Lackawanna, which is cited along with Association of Bar for the proposition, presumably well understood by the City in 2007, that an important public purpose does not alone qualify a nonprofit’s real property for an exemption under Real Property Tax Law § 420-a (1) (a). As “a preliminary matter,” the *641 General Counsel observed that Greater Jamaica’s tax-exempt status under federal law was “not determinative of the issue of charitable use of the property as defined by 420-a.”[5] Tellingly, though, she does not claim that DOF originally granted the exemption to Greater Jamaica in mistaken reliance on a presumption that Greater Jamaica was qualified therefor solely because of its federal tax-exempt status. For this reason, the majority’s lengthy discussion about a presumption is beside the point in this case, which involves a revocation.
Next, the General Counsel discounted Matter of Salvation Army v Town of Ellicott Bd. of Assessment Review (100 AD2d 361 [4th Dept 1984]) and similar unnamed cases on the ground that these authorities merely
“demonstrate [d] that where a commercial enterprise (such as a thrift shop) is incidental to the main exempt purpose (providing rehabilitation and therapy for religious and charitable reasons) the commercial aspect does not destroy the entitlement to the exemption. Here, the parking lots are not incidental to another recognized charitable purpose but are the very purpose for which the property is being used.”
This last statement dodges the issue. There is no question that the parking lots are being “used” as parking lots — i.e., areas where visitors to Jamaica’s urban core may leave their vehicles temporarily for a fee; the question is whether this use is incidental to Greater Jamaica’s broad charitable purpose to foster economic and community development, just as the thrift shop’s operation was incidental to the Salvation Army’s broadly stated exempt purposes. Additionally, DOF could have and should have been well-aware of the decision in Salvation Army in 2007. At that time, the agency would have been obligated to grant the exemption based on a determination that existing precedent supported the proposition that the parking facilities did, in fact, represent a use incidental to Greater Jamaica’s charitable purposes.
The General Counsel also discussed whether the fact that the properties were owned by Jamaica First, a single-member limited liability company, rather than by its sole member, *642 Greater Jamaica, disqualified Greater Jamaica from the exemption. In this regard, she stated that “it appears that [Jamaica First] collects amounts from the lots that exceed the carrying, maintenance and depreciation charges attributable to the premises” (see majority op at 624, citing this as a reason substantiating the City’s revocation of Greater Jamaica’s tax exemption). The General Counsel’s comment apparently refers to one of the requirements for determining whether to disregard Jamaica First as a separate entity; namely, the requirement that “[r]ent may not exceed carrying, maintenance and depreciation charges as specified in section 420-a” (NY City Dept of Fin Letter Ruling No. 074873-021, 2007 NY City Tax LEXIS 17 [emphasis added]; see also RPTL 420-a [2] [a nonprofit organization leasing real property to a corporation or association organized or conducted exclusively for one of the exempt purposes enumerated in section 420-a will receive an exemption for that property if it is used primarily for an exempt purpose and “any moneys paid for such use do not exceed the amount of the carrying, maintenance and depreciation charges of the property”]; Sisters of St. Joseph v City of New York, 49 NY2d 429 [1980]). But in this case, Greater Jamaica did not lease the parking facilities to or collect rent from Jamaica First (see Matter of Scenic Hudson Land Trust v Sarvis, 234 AD2d 301 [2d Dept 1996] and cases discussed therein).
Finally, the majority states that the “economic benefit conveyed by below-market rate parking . . . inures to the benefit of private enterprise,” and concludes, on that basis, that this use “cannot be said to further any charitable purpose.” To the extent that the majority argues that Greater Jamaica is not entitled to an exemption because it receives revenue, this misapprehends the nature of Greater Jamaica’s activities and our precedent. In a broad sense, the parking facilities benefit, and are used by, Greater Jamaica in two distinct ways. First, the parking facilities generate revenue, which is funneled back into Greater Jamaica’s numerous development initiatives. But crucially, the parking facilities directly further Greater Jamaica’s charitable purpose of economic rejuvenation by providing shoppers and other visitors a safe place to park while they patronize local businesses and educational, arts and religious institutions. This is not a situation where Greater Jamaica’s “avowed [charitable] purpose [ ] [is] a guise or pretense” for profit-making (RPTL 420-a [1] [b]).
In Lackawanna, by contrast, we held that the LCDC was not entitled to a real property tax exemption for land that was *643 leased to a for-profit manufacturing firm (Lackawanna, 12 NY3d at 580). In so holding, we explicitly noted that our decision was based solely on the fact that the only use of the property was as a revenue-producing rental. Greater Jamaica, however, does not simply use the parking facilities as revenue-generating properties meant to raise funds for its economic development mission; it does not lease the facilities to a for-profit enterprise. As a result, Greater Jamaica is more akin to the petitioners in Erie Sta.
In that case, one petitioner, Adult Home at Erie Station, Inc. (AHESI), operated an adult home that provided its elderly residents with housing and what AHESI described as “a program of personal care” (Erie Sta., 10 NY3d at 214). We held that although “renting homes to elderly people who are not poor is not a ‘charitable’ activity,” citing Greer Woodycrest and Presbyterian, AHESI’s property was “plainly [used for] a ‘charitable’ purpose” because the property was provided at below-market rates {id.).
The second petitioner in Erie Sta., Regional Economic Community Action Program, Inc. (RECAP), was in a different position than AHESI because RECAP received the market rate for its properties {id. at 215). Nonetheless, we held that RECAP’s property was also exempt from property taxation because “RECAP is engaged in social work, helping homeless people, alcoholics, drug addicts and other afflicted members of society to become productive and useful citizens,” which we characterized as “undoubtedly a charitable activity” {id.). We elaborated as follows:
“That [the beneficiaries of RECAP’s housing] pay market rents, and that RECAP may even benefit economically from its rental income, does not change the result. The issue is not whether RECAP benefits, but whether the property is ‘used exclusively’ for RECAP’s charitable purposes. RECAP could lose its exemption ... if the economic benefit went to its officers or employees personally, but an economic benefit to a charitable organization does not by itself extinguish a tax exemption. The question is how the property is used, not whether it is profitable” {id. at 216 [emphasis added]; see also Congregation Rabbinical Coll. of Tartikov, Inc. v Town of Ramapo, 17 NY3d 763, 765 [2011] [“an economic profit made by a religious corporation ‘does *644 not by itself extinguish a tax exemption’ ” (quoting Erie Sta., 10 NY3d at 216)]).
To sum up, cases decided both before and after 2007 support DOF’s 2007 decision to grant a tax exemption to Greater Jamaica for the parking facilities. DOF points to no change in law or the use of the property or any other objective consideration to justify its 2011 flip-flop. Before today, we had never ruled that a local government might simply change its opinion and revoke an exemption without some demonstrable predicate for its revised determination. Whether or not the 2011 revocation was improperly motivated, as Greater Jamaica and various amici contend, is impossible to say. On this record, all we know is that DOF interpreted the facts and the law one way in 2007, and the opposite way in 2011, although neither the facts nor the law had changed in the interim. Such an unexplained reversal of position is the very epitome of arbitrary administrative decisionmaking. Accordingly, I respectfully dissent.
Chief Judge Lippman and Judges Rivera, Abdus-Salaam and Fahey concur; Judge Read dissents in an opinion in which Judge Stein concurs.
Order reversed, with costs, and matter remitted to the Appellate Division, Second Department, for consideration of the issues raised but not determined on the appeal to that court.

. Greater Jamaica’s certificate of incorporation delineates seven specific charitable corporate purposes: (1) to promote, assist, participate in and coordinate sound planning and improve development of Jamaica’s business-commercial-retail district; (2) to encourage and effect the development and expansion of commercial, industrial and manufacturing facilities in Jamaica; (3) to support and assist in the planning, development and expansion of educational, cultural, recreational, residential, governmental, transportation and other related facilities in Jamaica; (4) to carry on research and other studies in order to develop an overall comprehensive plan and subsidiary plans as may be necessary or appropriate for Jamaica’s sound growth and improved development; (5) to provide assistance of every kind, including the rendering of advice, technical services and financial aid in connection with securing private or government aid to individuals, associations, corporations and other organizations, whether organized for profit or otherwise, interested in or working toward the sound growth and improved development of Jamaica or any part thereof, and to provide such assistance in connection with the formation of such organizations; (6) to assist and cooperate with federal, state and local departments, agencies and government organizations of every kind in furtherance of Greater Jamaica’s purposes to the end that Jamaica shall receive the maximum possible benefit from federal, state and local programs; and (7) to assist and cooperate with other organizations in furtherance of the aforesaid purposes.

. Hereafter, “Greater Jamaica” refers collectively to Greater Jamaica and Jamaica First, unless the context specifically indicates otherwise. As a single-member limited liability company, Jamaica First is generally treated as a branch or division of its owner, Greater Jamaica, for federal income tax purposes rather than as a separate entity (see 26 CFR 301.7701-3). Similarly, the City disregards single-member limited liability companies as separate entities for purposes of RPTL 420-a (1) (a) so long as certain requirements are fulfilled (see e.g. NY City Dept of Fin Letter Ruling No. 074873-021, 2007 NY City Tax LEXIS 17 [Nov. 21, 2007]). The New York City Department of Finance’s General Counsel raised a question about whether Greater Jamaica and/or Jamaica First met certain of these requirements when she informed Greater Jamaica that its real property tax exemption was going to be revoked. Although repeatedly referring to the five properties as “a standalone, for-profit, commercial parking garage” or a “free-standing commercial parking lot,” the City does not suggest on this appeal that Greater Jamaica and Jamaica First are separate entities.

. Section 420-a (1) (a) reads as follows:
“Real property owned by a corporation or association organized or conducted exclusively for religious, charitable, hospital, educational, or moral or mental improvement of men, women or children purposes, . . . and used exclusively for carrying out thereupon one or more of such purposes either by the owning corporation or association . . . shall be exempt from taxation.”

. Citing Lackawanna, the City claims that we have “held that the economic revitalization of a distressed community does not qualify as a charitable purpose under RPTL 420-a.” To the contrary, in Lackawanna we pointedly “pause [d] to note [that] we [were] not deciding . . . whether [the property at issue] was exempt from taxation prior to LCDC’s leasing it to an entity that carrie [d] out for-profit manufacturing activities on the property” (Lackawanna, 12 NY3d at 581 [emphasis added]). Instead, “we assume[d] without deciding that prior to . . . being leased, the [property at issue] held by LCDC was exempt from taxation” {id.).

. This comment, as is the case with much of what the letter says, seems to respond to a submission made by Greater Jamaica, which is not included in the record.